# United States Court of Appeals
## For the First Circuit

Nos. 01-2148
    01-2150
    01-2151
    01-2152

UNITED STATES,

Appellee,

v.

RAFAEL AYALA AYALA, ROBERT F. KENNEDY, JR., DENNIS HICKEY RIVERA,
and ARMANDO TORRES ORTÍZ,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Héctor M. Laffitte, U.S. District Judge]

Before

Torruella, Selya, and Lipez, Circuit Judges.

Harry Anduze Montaño for appellants Kennedy and Rivera.

Linda Backiel for appellants Ayala and Ortíz.

Stella Song, Assistant United States Attorney, with whom
Guillermo Gil, United States Attorney, Jorge E. Vega-Pacheco,
Assistant United States Attorney, and Frank J. Bustamonte, Special
Assistant United States Attorney, were on brief, for appellee.

April 29, 2002

**LIPEZ, <u>Circuit Judge</u>.**  Rafael Ayala Ayala, Robert F. Kennedy, Jr., Dennis Hickey Rivera, and Armando Torres Ortíz were convicted of entering onto the Camp García Naval Installation on the island of Vieques, in violation of 18 U.S.C. § 1382. Unpersuaded by their arguments on appeal, we affirm their convictions.

## I. Background

On April 28, 2001, appellants participated in a campaign of civil disobedience aimed at disrupting live-fire artillery and bombardment exercises which the Navy periodically conducts in and around Vieques.  Each was charged with violating 18 U.S.C. § 1382 (barring entry "upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation").  The four cases (along with four others) were consolidated for trial in the district court on July 6, 2001.  Appellants were convicted and sentenced to thirty days' imprisonment.

On appeal, Ayala and Ortíz argue that the informations against them should have been dismissed because the government failed to take them before a magistrate within 48 hours of their arrest; that the government did not prove that they had entered onto a naval installation in violation of 18 U.S.C. § 1382; and that the evidence at trial was insufficient to establish that they were among the individuals detained on Vieques on April 28, 2001. Kennedy and Rivera argue that the district court judge erred in refusing to permit them to put on a defense of necessity, and in

-2-

not recusing himself from the case.  We address these issues in turn.

## II. The 48-Hour Rule

Federal Rule of Criminal Procedure 5(a) states, in pertinent part, that "any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available federal magistrate judge."  Although Rule 5(a) does not specify what would constitute an "unnecessary delay," courts have construed the Fourth Amendment as imposing a presumptive 48-hour time limit on detentions in the absence of a probable cause determination.[1]  "Where an arrested individual does not receive a probable cause determination within 48 hours," the burden is on the government "to demonstrate the existence of a bona fide emergency or other extraordinary circumstance."  County of Riverside v. McLaughlin, 500 U.S. 44, 57 (1991).  Having been brought before a magistrate approximately 51 hours after their initial detention, Ayala and Ortíz argue that the district court erred in denying their motion to dismiss the informations against them on that ground.  We review the district court's construction of Rule 5(a) and the Fourth Amendment de novo, and its factual determinations for clear error.  United States v. Encarnacíon, 239 F.3d 395, 397 (1st Cir. 2001).

---

[1]  On the interaction of Rule 5(a) and the Fourth Amendment, we have observed that "[w]hile the Rule 5(a) and Fourth Amendment contexts are certainly analogous, the 48-hours rule is a requirement of the Fourth Amendment, not Rule 5(a)." United States v. Encarnacíon, 239 F.3d 395, 398 n.2 (1st Cir. 2001) (citation and internal quotation marks omitted).

-3-

Ayala and Ortíz's motion to dismiss asserted the following facts, which the government has not disputed. Appellants were detained by military personnel at approximately 11:20 a.m. on April 28 and transported to a detention/processing center at Camp García (on Vieques), where they were searched, questioned, and photographed. The next morning appellants were transported by boat to Roosevelt Roads, a naval installation on the main island of Puerto Rico, where they were again searched, questioned, and photographed. "Late on Sunday night," April 29, appellants were moved to the Metropolitan Detention Center in Guaynabo. Some time after 2:00 p.m. on April 30, Ayala and Ortíz were taken before a magistrate.

The government filed a cursory response: "The motion is without merit. It has been rejected by the sections of this Court considering this issue. See e.g. Memorandum Order by Judge José Antonio Fusté, dated June 1, 2001, in the case of United States v. Cecilio Lebron, #01-330. Based upon the extraordinary demands fixed by the large number of arrestees brought over from Vieques Island, the time elapsed was not unreasonable."

At trial, in denying the motion to dismiss, the district court said that 181 individuals had been arrested in the "wave" of trespassers which included Ayala and Ortíz, and that the large number of detainees, and the transportation required to get them before a magistrate, constituted "extraordinary circumstances" that warranted an exception to the 48-hour rule. The district court was entitled to take judicial notice of the 181 arrests, a circumstance

-4-

readily ascertainable by the district court. See Fed. R. Evid. 201(b)(2) (authorizing judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"). Although the relevant facts in the record are regrettably sparse, the district court concluded correctly that over 100 civil disobedience arrests at a naval base on an island off the coast of Puerto Rico, executed in the midst of a military exercise, constitute an extraordinary circumstance sufficient to justify the slight delay beyond 48 hours in bringing Ayala and Ortíz before a magistrate.[2]

---

[2] In United States v. Salivas-González, 147 F. Supp. 2d 58 (D.P.R. 2001), a case arising out of the same Vieques protest, Judge Fusté ruled that delays in excess of 48 hours in taking detainees before a magistrate were justified by extraordinary circumstances. This is presumably the opinion the government had in mind in its motion to dismiss, which cited a "Memorandum Order by Judge José Antonio Fusté, dated June 1, 2001" (same date as Salivas-González). Judge Fusté gave a detailed explanation of the circumstances which he deemed extraordinary:

> The logistics entailed by the Navy arrest and processing, and the eventual civil processing and transportation of the arrestees to the metropolitan area was not a simple task. The majority of Deputy U.S. Marshals available had been previously assigned to secure the perimeters within the naval base at Camp García, leaving a small number of Deputy U.S. Marshals available for the processing of arrestees. Thus, special consideration should be given to:
>
> > (a) the limited transportation means between Vieques and Puerto Rico;
> >
> > (b) the burdensome conditions being faced by the U.S. Marshals (limited available personnel to arrest, process, and transport over one-hundred arrestees, while still meeting security requirements);
> >
> > (c) the large number of violent incidents being reported (which excluded the possibility

In Encarnacíon, we reserved the question "whether Rule 5(a) can ever be a basis for dismissal of an indictment absent evidence of unwarranted interrogation during the period of detention." 239 F.3d at 400 n.5. Without now deciding that question, we also note the absence in this case of any claim of prejudice arising out of appellants' detention beyond 48 hours.

## III. The Informations

The informations charged that Ayala and Ortíz had entered onto "lands reserved for the exclusive jurisdiction of the United States" in violation of 18 U.S.C. § 1382, which provides for punishment of "[w]hoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation." Ayala and Ortíz moved under Federal Rule of Criminal Procedure 29 for a judgment of

> of assigning a judicial officer to conduct initial proceedings to any other place than secure/court premises) . . . .

> [U]pon receiving notice that the U.S. Marshals did not have sufficient personnel to escort over one-hundred arrestees to court, arrangements were made to hold the initial appearances at MDC-Guaynabo, the most logical place that could accommodate the large number of people to be handled. All regular visits to MDC had to be canceled by the Bureau of Prisons. Equipment was gathered for use, such as copy machines and faxes. Personnel was assigned to process the individuals, including two magistrates, two courtroom deputy clerks, two interpreters, and various other court employees. A system had to be devised between the Clerk's Office and MDC to coordinate bond, bond setting and taking of the bond monies.

Id. at 61-62 (footnote omitted).

acquittal at the close of the prosecution's case, arguing, inter alia, that the piece of land on which they were arrested, the South Salinas Finger, is not "reserved for the exclusive jurisdiction of the United States," as the informations allege. In their view, the South Salinas Finger is not part of a "military, naval, or Coast Guard reservation," but instead is "submerged land[]" which has been placed "under the control of the government of Puerto Rico" pursuant to 48 U.S.C. § 749. Our review of the district court's denial of a Rule 29 motion is de novo. United States v. Frigerio-Migiano, 254 F.3d 30, 33 (1st Cir. 2001).

We agree with Ayala and Ortíz that the government failed to prove that the South Salinas Finger is encompassed within the boundaries of the Camp García naval reservation proper. Petty Officer Larry Werner Roberts II described the South Salinas Finger as "a little island on the south" side of Vieques. He testified that "[i]t has a little land that connects the beach to the island," a natural bridge of approximately 35 feet.[3] However, a line on the map the prosecution offered into evidence depicting the ordinary high-tide line at Vieques -- the boundary of the Navy's holdings -- does not encompass the location of the South Salinas

_____

[3] Although Roberts described the South Salinas Finger as an "island," the government says that it is a peninsula. The evidence, however, did not establish whether, at high tide, the South Salinas Finger is connected to Vieques by land. Roberts testified that he did not recall his feet getting wet as he walked out to this "island," but there was no testimony concerning the status of the tide at the time of the arrests. We need not resolve this question, because, as explained infra, the government was not required to prove that the South Salinas Finger was part of Camp García proper.

-7-

Finger.  Instead, the portion of the map that corresponds to its location is blank.

As the line on the Navy's map marking the mean high-tide line around Camp García does not depict the South Salinas Finger, Ayala and Ortíz argue that it must therefore be among Puerto Rico's "submerged lands," which are "under the control of the government of Puerto Rico."  48 U.S.C. § 749.[4]  The statute defines "control" to include "all right, title and interest in and to and jurisdiction and authority over the submerged lands underlying the harbor areas and navigable streams and bodies of water in and around the island of Puerto Rico and the adjacent islands and waters."  Id. § 749(3).  Ayala and Ortíz assert that the South Salinas Finger "is a classic example of submerged coastal [lands] over which 'all right, title and interest in and to and jurisdiction and authority' has been placed in the hands of Puerto Rico" (quoting 48 U.S.C. § 749(3)), and that their venture onto the South Salinas Finger thus could not have been an entrance onto lands "reserved for the exclusive jurisdiction of the United States," as the informations allege.

Again, Ayala and Ortíz have a point.  Because the government failed to prove that the South Salinas Finger is above the mean high-tide line, we must accept the proposition in this case that it is indeed "submerged land[]" placed "under the control

_____

[4] "Submerged lands" are defined to "include lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide."  48 U.S.C. § 749(1).

-8-

of the government of Puerto Rico" by 48 U.S.C. § 749. Such submerged lands are not "<u>reserved</u> for the <u>exclusive</u> jurisdiction of the United States," as the informations allege. However, "[c]onvictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment. A part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as a useless averment that may be ignored." <u>United States</u> v. <u>Miller</u>, 471 U.S. 130, 136 (1985) (internal quotation marks omitted). In other words, "[s]urplusage in an indictment need not be proved." <u>United States</u> v. <u>McVeigh</u>, 153 F.3d 1166, 1196 (10th Cir. 1998). The phrase "on lands reserved for the exclusive jurisdiction of the United States" is surplusage.[5] If we disregard it, the informations still charge unmistakably that Ayala and Ortíz knowingly and unlawfully entered

---

[5] The text of the information charging Ortíz with a violation of § 1382 reads as follows:

On or about April 28, 2001, in the District of Puerto Rico and within the jurisdiction of this Court, that is, on Camp Garcia Naval Installation at Vieques, Puerto Rico, that is, on lands reserved for the exclusive jurisdiction of the United States, ARMANDO TORRES ORTIZ, defendant, did knowingly and unlawfully go upon said Naval installation for any purpose prohibited by law or lawful regulation, that is, 32 CFR Section 770.35 through 770.40, without first having obtained permission from the Commanding Officer as required by the aforesaid regulations. All in violation of Title 18, United States Code, Section 1382.

The text of the information charging Ayala is identical in all material respects.

the Camp García Naval Installation in violation of 18 U.S.C. § 1382.[6]

The government's proof at trial established this unlawful entry. In United States v. Ventura-Meléndez, another Vieques trespassing case, we held that "'government ownership of the property in question is not a requisite to violating Section 1382.'" 275 F.3d 9, 16 (1st Cir. 2001) (quoting United States v. Allen, 924 F.2d 29, 31 (2d Cir. 1991)). Instead, a conviction under 18 U.S.C. § 1382 "requires only that the government demonstrate either a possessory interest in, or occupation or control of, the area reserved by the military." Id. at 17. Applying that rule to the installation on Vieques, we held that a portion of "the area beyond the mean high-tide lines [was] under the occupation and control of the Navy for purposes of § 1382" because "a large swath of area extending beyond the shoreline of the beach was permissibly designated as part of a 'danger zone' by federal regulation" and therefore was subject to Navy occupation and control. Id. at 17 (citing 33 C.F.R. §§ 334.2, 334.1480). We explained that "Puerto Rico's jurisdiction over the shoreline was established subject to the control of the United States." Id.

---

    [6] The surplus language in the informations does not obscure the conduct that the government alleges violated § 1382: entry onto the Camp García Naval Installation. Ayala and Ortíz do not claim to have been in any way misled or unfairly prejudiced in their defense by the government's inaccurate description of the land as "reserved for the exclusive jurisdiction of the United States." See Miller, 471 U.S. at 138 n.5. (disregarding surplusage where appellant "show[ed] no prejudice to his ability to defend himself at trial").

There was uncontested evidence at trial that the South Salinas Finger, the land on which Ayala and Ortíz were found, was located inside a "danger zone" established by federal regulation. See 33 C.F.R. §§ 334.2, 334.1470. A "danger zone" is "[a] defined water area . . . used for target practice, bombing, rocket firing or other especially hazardous operations, normally for the armed forces," and "may be closed to the public on a full-time or intermittent basis, as stated in the regulations."[7] 33 C.F.R. § 334.2(a).

Ayala and Ortíz counter that they were not charged with violating 33 C.F.R. § 334.1470 (barring entry into a danger zone), but rather 32 C.F.R. § 770.40 (barring entry onto "U.S. Naval installations and properties"). However, we held in Ventura-Meléndez, 275 F.3d at 16-18, that the language of § 1382, which on its face is limited to "[w]hoever . . . goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard,

_____

[7] The boundaries of the danger zone that encompasses the South Salinas Finger are as follows:

From Punta Conejo on the south coast of Vieques at latitude 18°06'30", longitude 65°22'33"; thence to latitude 18°03'00", longitude 65°21'00"; thence to latitude 18°03'00", longitude 65°15'30"; thence to latitude 18°11'30", longitude 65°14'30"; thence to latitude 18°12'00", longitude 65°20'00"; and thence to Cabellos Colorados on the north coast of Vieques at latitude 18°09'49", longitude 65°23'27".

§ 334.1470(a). The danger zone is "open to navigation at all times except when firing is being conducted. At such times, no persons . . . shall enter or remain within the danger area." § 334.1470(b)(1).

-11-

station, or installation," also extends to those who enter into a danger zone in proximity to a reservation, post, fort, arsenal, yard, station, or installation. That being so, the distinction Ayala and Ortíz advance, between entering a danger zone and entering a naval installation, is without significance in this context.[8]

## IV. Notice

Section 1382 bars entry into a military installation "for any purpose prohibited by law or lawful regulation." To establish a prohibited purpose, the informations cited 32 C.F.R. § 770.40, which provides that "[a]ny person entering or remaining on U.S. Naval installations and properties in Puerto Rico, without the advance consent of [enumerated officials], shall be . . . subject to the penalties prescribed by 18 U.S.C. § 1382." This reliance on the regulation is consistent with our holding in United States v. Parrilla Bonilla, 648 F.2d 1373, 1377 (1st Cir. 1981), that "the

_____

[8] There was also uncontroverted evidence that the South Salinas Finger was inside a security zone that was in existence on April 28, 2001. A security zone is "an area of land, water, or land and water which is so designated by the Captain of the Port or District Commander for such time as is necessary to prevent damage or injury to any vessel or waterfront facility, to safeguard ports, harbors, territories, or waters of the United States or to secure the observance of the rights and obligations of the United States." 33 C.F.R. § 165.30(a). The regulations provide that "[n]o person or vessel may enter or remain in a security zone without the permission of the Captain of the Port." 33 C.F.R. § 165.33(a). In Allen, the Second Circuit held that unauthorized entry into a security zone around a naval reservation was itself a violation of 18 U.S.C. § 1382. 924 F.2d at 30-31. As appellants' entry into the danger zone is sufficient to support their conviction, we need not decide whether entry into the security zone alone in this case violated § 1382.

requisite prohibited 'purpose' under section 1382 can consist of unauthorized entry itself."

We have said that "when a section 1382 prosecution proceeds on the basis that the defendant has entered a restricted military reservation 'for the purpose of' unauthorized entry, . . . it must be shown that the defendant had knowledge or notice that such entry was, in fact, prohibited." Id. In the case of the regulation establishing the danger zone at issue in Ventura-Meléndez, the regulation itself states that "[n]o person or vessel shall enter or remain within the restricted areas at any time unless on official business." § 334.1480(b). The regulation establishing the danger zone at issue in this case, however, stipulates that "[i]t will be open to navigation at all times except when firing is being conducted. At such times, no persons . . . shall enter or remain within the danger area." § 334.1470(b)(1). To prove a violation of § 1382, then, the government was required to demonstrate that notice was given that the danger zone was closed to the public at the time of the arrests.

There was testimony to that effect at trial. Lieutenant Commander Russell Gottfried indicated that notice of imminent military activities within the danger zone had been given in the form of a fishermen's notice that was distributed around Vieques a week in advance of the exercises. In addition to the fishermen's notice, Gottfried testified that a temporary security zone was established to prevent intrusions into the danger zone during the

live-fire exercises, and that he heard notice of the security zone broadcast over marine band radio "several times a day in the course of the operations."[9]  In the Navy's view, these broadcasts supplied additional notice that entry into the danger zone -- and thus onto the South Salinas Finger -- was prohibited.[10]

Although there are two vague references to lack of notice in their brief, Ayala and Ortíz do not make a developed mens rea argument to the effect that they personally lacked knowledge or notice of the exclusion of the public from the South Salinas Finger.  The two references appear in the section of the brief challenging the government's failure to prove that appellants were found on land "reserved for the exclusive jurisdiction of the United States."  There Ayala and Ortíz assert that "the Navy had taken no action to warn others that it considered [the South Salinas Finger] part of its exclusive domain in Vieques" (emphasis added). This statement is explicitly linked to the exclusive jurisdiction argument that we have rejected.  They subsequently add that the land was "in no way posted or otherwise identified to the public as part of Camp García or land controlled by the Navy."[11]

_____

[9]  The security zone is described supra at note 8.

[10]  Of course, the broadcasts also served to give notice that entry into the security zone itself was prohibited.

[11]  There is arguably a third, even more oblique reference, to a lack of warning that the South Salinas Finger was off limits to the public.  Appellants say that the danger zone created for exercises in Vieques did not warn that violation would result in prosecution.  This statement seems to register a complaint about an inadequate warning of the consequences of a violation.  Notably, the comment does not suggest a misapprehension about the fact that entry into the danger zone would be a violation.

-14-

This unelaborated reference to inadequate notice falls far short of a developed argument that the government's proof did not satisfy the mens rea element of § 1382.  To the extent that there is a mens rea claim lurking in the exclusive jurisdiction argument of Ayala and Ortíz, we deem it waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

## V. Identification of Ayala and Ortíz

Petty Officer Roberts testified that on April 28, 2001, he detained four people on the South Salinas Finger.  Rather than identify those individuals in court, or testify to an out-of-court identification pursuant to Federal Rule of Evidence 801(d)(1)(C), Roberts simply stated that he recognized four photographs the prosecutor displayed to him as having been taken on April 28 in his presence.[12]  Although appellants acknowledge that the thrust of this testimony was that the individuals in the photographs were the persons arrested on April 28 on the South Salinas Finger, they point out that Petty Officer Roberts never identified the individuals in the photographs.  Instead, the prosecutor submitted the photographs to the court, with the explanation that "Government Exhibit 9 is the photograph of Rafael Ayala-Ayala; No. 10 is that of Defendant Armando Torres-Ortíz."  The district court overruled appellants' objection to the prosecutor's explanation.

_____

[12]  Petty Officer Roberts himself appeared in the photographs of Ayala and Ortíz.

-15-

Ayala and Ortíz argued in their Rule 29 motion that there was insufficient evidence to support a finding that they were the individuals detained on the South Salinas Finger.[13]  The court ruled that in-court identification was not required, "[a]s long as there is evidence in the record that shows that the person that was arrested is the person that is being accused."

"Identification of the defendant as the person who committed the charged crime is always an essential element which the government must establish beyond a reasonable doubt.  However, in-court identification by a witness is not necessarily required. 'Identification can be inferred from all the facts and circumstances that are in evidence.'" United States v. Alexander, 48 F.3d 1477, 1490 (9th Cir. 1995) (citations omitted) (quoting United States v. Weed, 689 F.2d 752, 754 (7th Cir. 1982)).  Petty Officer Roberts testified that the individuals he arrested on April 28 on the South Salinas Finger were those depicted in the photographs which the prosecutor submitted to the court. At the outset of the trial defense counsel had indicated to the court that she was appearing "on behalf of Armando Torres-Ortiz and Rafael Ayala-Ayala."  See Alexander, 48 F.3d at 1490 ("[I]n-court identification is not necessary when the defendant's attorney himself identifies his client at trial.").  The trial judge was

_____

[13]  A heading in appellants' brief includes Rivera among the appellants raising the identification issue.  The argument under that heading, however, refers only to Ayala and Ortíz.  To the extent that Rivera has stated an appeal on this issue, we reject it for the same reasons we reject the appeals of Ayala and Ortíz.

-16-

therefore in a position to make the necessary identification finding based on a visual comparison of the photographs with the defendants in the courtroom. The evidence was sufficient to support a finding, beyond a reasonable doubt, that defendants Ayala and Ortíz were among those detained on the South Salinas Finger on April 28.

## VI. The Necessity Defense

Appellants Kennedy and Rivera argue that the district court erred in refusing to permit them to present the defense of necessity. Kennedy and Rivera assert that they reasonably believed that entering the Camp García installation was necessary to avert a greater evil, which they characterize as "the Navy's violation of the procedural and substantive requirements of the Endangered Species Act [16 U.S.C. § 1531 et seq.] by continuously bombing Vieques without completing or submitting to the United States Fish and Wildlife Service . . . a proper biological assessment, detailing the [likely] impact of the bombing on 13 separate species of endangered or threatened animals and [plants] in the Vieques area and the attendant harm to the species." We review a decision to bar presentation of a specific defense at trial de novo. United States v. Maxwell, 254 F.3d 21, 26 (1st Cir. 2001).

"The necessity defense requires the defendant[s] to show that [they] (1) [were] faced with a choice of evils and chose the lesser evil, (2) acted to prevent imminent harm, (3) reasonably anticipated a direct causal relationship between [their] acts and the harm to be averted, and (4) had no legal alternative but to

-17-

violate the law." Id. at 27. Before putting on a necessity defense, however, an initial hurdle must be cleared: if a "proffer in support of an anticipated [necessity] defense is insufficient as a matter of law to create a triable issue, a district court may preclude the presentation of that defense entirely." Id. at 26.

We need not address the sufficiency of appellants' proffer on the first two elements of the necessity defense because we conclude that they failed to establish the third and fourth elements of the defense. Appellants were required to show that they "reasonably anticipated a direct causal relationship between [their] acts and the harm to be averted." Id. at 27. They argue that because it is the Navy's practice to suspend live-fire exercises when civilians are spotted in the area, it was reasonable for them to have believed that their presence on Vieques would cause at least a temporary suspension of the exercises. However, we rejected a similar necessity defense advanced in another Vieques trespassing case, observing that "[a]ppellants offered no evidence to support their claim that their trespassory protests will result in a change of U.S. Naval policy so that the bombing and ammunition testing in Vieques will cease." United States v. Sued-Jiménez, 275 F.3d 1, 7 (1st Cir. 2001). In short, there is not a direct causal relationship between the trespassing and the harm to be averted, beyond the sort of "temporary cessation" of the bombing that we have found insufficient to support a necessity defense. Id.

Nor have Kennedy and Rivera exhausted all legal alternatives to violating the law. We have observed that "the

decided cases teach that a defendant's legal alternatives will rarely, if ever, be deemed exhausted when the harm of which he complains can be palliated by political action." Maxwell, 254 F.3d at 29. Appellants submit that the district court's failure to act on their demand for a preliminary injunction barring military exercises on Vieques indicates that they had no legal alternative to engaging in civil disobedience.[14] There are, however, innumerable forms of political and legal action that Kennedy and Rivera could have undertaken in pursuit of their objective of stopping the bombing on Vieques. See Maxwell, 254 F.3d at 28-29. While legally sanctioned forms of activism might not have achieved an immediate halt to the military exercises, "appellants cannot claim they have no legal alternatives merely because their law-abiding efforts are unlikely to effect a change in policy as soon as they would like." Sued-Jiménez, 275 F.3d at 7. A contrary holding "would be tantamount to giving an individual carte blanche to interpose a necessity defense whenever he becomes disaffected by the workings of the political process." Maxwell, 254 F.3d at 29.

---

[14] That demand was made in a lawsuit filed by Water Keeper Alliance, of which appellants Kennedy and Rivera are members, in October of 2000. As of April 28, 2001, the district court had not acted on the demand for a preliminary injunction. See Water Keeper Alliance v. United States Dept. of Def., 152 F. Supp. 2d 155 (D.P.R. 2001). Appellant Kennedy is also an attorney for Water Keeper Alliance. The district court denied the motion for a preliminary injunction in June of 2001, and we affirmed that denial in November of 2001. See Water Keeper Alliance v. United States Dept. of Def., 271 F.3d 21 (1st Cir. 2001).

## VII. Recusal of the District Court Judge

Kennedy and Rivera appeal the district court judge's denial of their motion that he recuse himself from the case. Under 28 U.S.C. § 455(a), a federal judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." They argue that because the judge had presided over a lawsuit seeking to halt the bombing exercises on Vieques that was filed by the Water Keeper Alliance, an organization of which Kennedy and Rivera were members and for whom Kennedy was an attorney, "a reasonable observer could conclude that [his] impartiality in the criminal case was compromised."[15] The allegation is not one of actual bias, but rather that an appearance of partiality existed. See United States v. Snyder, 235 F.3d 42, 45 (1st Cir. 2000) (28 U.S.C. § 455 "forbids not only the reality of partiality but its objective appearance as well"). Kennedy and Rivera suggest that recusal is in order "when participants in a civil case . . . become criminal defendants before the same judge, accused, in essence, of attempting to obtain by 'self-help' the relief they had sought to obtain . . . in the civil action."[16] We

---

[15] See supra at note 14 for the history of the Water Keeper litigation.

[16] In the view of Kennedy and Rivera, the recusal issue is linked to the necessity defense. Kennedy and Rivera argue that recusal was required because "an objective person . . . could reasonably perceive one of the factual elements of [the necessity] defense -- . . . Kennedy and Rivera'[s] belief that [the] Court's failure to rule on their preliminary injunction motion prior to the bombing on April 27, 2001 left them with no alternative but to enter [Camp García] in order to stop [the] bombing -- to be an affront to the Court's authority in the civil case."

review the refusal of a trial judge to recuse himself for abuse of discretion. Id. at 46.

We discern no abuse of discretion in the district court judge's decision not to recuse himself. We have said that disqualification is appropriate when "the facts asserted provide what an objective, knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality." In re Boston's Children First, 244 F.3d 164, 167 (1st Cir. 2001) (internal quotation marks omitted). "Prior judicial exposure to a defendant or defendants, without more, is . . . not enough [to establish bias]." United States v. Parrilla Bonilla, 626 F.2d 177, 180 (1st Cir. 1980). Kennedy and Rivera made no showing that the district court judge's impartiality could reasonably be questioned. We therefore conclude that the judge did not abuse his discretion in declining to recuse himself.

**Affirmed.**