# United States Court of Appeals
## For the First Circuit

No. 03-1022

UNITED STATES OF AMERICA,

Appellee,

v.

EDWIN RAFAEL CORNIER-ORTIZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

Before

Lynch, Circuit Judge,
Campbell, Senior Circuit Judge,
and Lipez, Circuit Judge.

Maritza Gonzalez de Miranda, Assistant United States Attorney, with whom H.S. Garcia, United States Attorney, Sonia I. Torres, Assistant United States Attorney, and Thomas F. Klumper, Assistant United States Attorney, were on brief, for appellee.

David W. Roman, with whom Brown & Ubarri was on brief, for appellant.

March 17, 2004

**LYNCH**, **Circuit Judge**.  This public corruption case from Puerto Rico resulted in the conviction, for misuse of federal housing monies from 1996 to 2001, of the sole defendant, Edwin Rafael Cornier-Ortiz.  Cornier was the general manager, sequentially, of two private for-profit management corporations, CORA and ERCO.  Cornier worked with others -- including a HUD division director, a contract employee of the Puerto Rico Public Housing Authority, and their relatives -- to divert United States Department of Housing and Urban Development ("HUD") funds that were meant for the administration of low-income housing projects in Puerto Rico.  The schemes alleged involved fraud, kickbacks, sham contracts, ghost employees, and conflicts of interest.  Others involved were convicted under separate indictments.

Cornier claimed to be an innocent victim caught in the corrupt schemes of others.  He was sentenced to fifty-two months in prison and three years of supervised release, and sentenced to pay restitution of $136,056.00 to HUD.  Cornier appeals both his conviction, on insufficiency of evidence grounds, and his sentence requiring restitution.  We affirm the conviction, but vacate part of the restitution order.

**I.**

Cornier was indicted on eight counts, all related to misuse of federal housing funding.  Cornier pled not guilty.  After an eight-day jury trial on the first seven counts, he was convicted

-2-

on six of those seven counts: aiding and abetting the theft or misapplication of federal funds in violation of 18 U.S.C. §§ 666(a)(1)(A) and (2) (Count One); conspiring to defraud the United States by violating 18 U.S.C. § 666, in violation of 18 U.S.C. § 371 (Count Three); aiding and abetting the theft or misapplication of federal funds in violation of 18 U.S.C. §§ 666(a)(1)(A) and (2) (via a different scheme than the scheme implicated by Count One) (Count Four); aiding and abetting extortion in violation of 18 U.S.C. §§ 1951(a) and (b) (Count Five); money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and (2) (Count Six); and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) (Count Seven). He was acquitted on Count Two, which charged him with aiding and abetting the solicitation and acceptance of a kickback in violation of 41 U.S.C. §§ 51, 53, and 54.

Essentially, Count One involved a scheme in which Cornier, as general manager of CORA, hired the brother of a housing authority employee to prepare and submit vouchers for federal CGP funds and then lied about the nature of the brother's employment to the CORA board. The work -- both preparing vouchers for submission to the housing authority and the underlying modernization work evidenced by the vouchers -- appears to have been done. The preparation of the vouchers, however, was done by the housing authority employee, who also approved the payment of the vouchers

-3-

when they were submitted to the housing authority, and not by the brother. As to this scheme, Cornier says that no real harm was done.

Counts Three through Seven involved a later scheme with Cornier's next company, ERCO. ERCO employed at an excessive salary the half-brother of a HUD official. The brother did little work, but he received a handsome salary of $15,000 a month, kept $4,000 of it, and passed along the remaining $11,000 to the HUD official. As to this scheme, Cornier claims that he was forced into feeding the greed of the HUD official, was himself a victim of the official's extortion, and was entitled to judgment in his favor. There is no claim of trial error, only that the evidence was insufficient.

At sentencing, the district court addressed Count Eight, which charged Cornier with forfeiture of assets related to the offenses in the other counts, and ordered Cornier to pay restitution in the amount of $136,056.00 to HUD. Of that amount, $61,804.80 was connected with the Count One conviction. Cornier now appeals his convictions and the order to pay restitution as to Count One.

**II.**

A. <u>Sufficiency of the Evidence</u>

Cornier argues that the district court erred in denying his Rule 29 motions for judgment of acquittal as to all six

offenses.  We review the denial of Rule 29 motions de novo.  United States v. Zenon-Rodriguez, 289 F.3d 28, 32 (1st Cir. 2002); United States v. Ayala-Ayala, 289 F.3d 16, 21 (1st Cir. 2002).  Our review of the sufficiency of the evidence requires us to ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis omitted); United States v. Casas, 356 F.3d 104, 126 (1st Cir. 2004) ("We draw all reasonable evidentiary inferences in harmony with the verdict and resolve all issues of credibility in the light most favorable to the government."); United States v. Henderson, 320 F.3d 92, 102 (1st Cir. 2003).

Some background facts about the funding of public housing projects in Puerto Rico are necessary to understand the schemes involved in this case.  HUD allocates federal monies to Puerto Rico for the administration of low-income public housing projects.  Most of that federal funding is allocated to cover the costs of managing and operating the housing projects.  A different portion of the federal funding is allocated to pay for periodic modernization of the housing projects.  HUD disburses this modernization funding based in part on a Comprehensive Grant Program ("CGP"), so the funds are called CGP funds.  The Puerto Rico Public Housing Administration ("PRPHA") receives the federal funds from HUD and is

-5-

charged with administering the Commonwealth's public housing projects. Pursuant to a 1992 agreement between the government of Puerto Rico and HUD, management of the low-income housing projects in Puerto Rico is done by private management agencies. Such agencies submit bid proposals to PRPHA, and the proposals are then evaluated by a PRPHA bid board. A private management agency that has been awarded a management contract by PRPHA is paid a management fee under the contract using federal funds from HUD. In addition, the private management agency may submit requests to PRPHA for CGP funding in connection with the documented expenses of modernizing and improving its assigned housing projects.

### 1. Count One

Under Count One,[1] violation of 18 U.S.C. § 666, the government had to prove beyond a reasonable doubt: (1) that Cornier was "an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof"; (2) that Cornier embezzled, stole, obtained by fraud, knowingly converted, or intentionally misapplied property that is "valued at $5,000 or more" from "such organization, government, or agency"; and (3) that such "organization, government, or agency receives, in any one year

---

[1] Count One charged that, from 1995 to 1997, Cornier, an agent of an organization as defined in 18 U.S.C. § 666, along with other such agents, aided and abetted the violation of 18 U.S.C. § 666 by willingly and intentionally embezzling, stealing, obtaining by fraud, converting, or misapplying $61,804.80 that was the property of the PRPHA, an organization that received in excess of $10,000 in a one-year period under a federal program.

period, [federal assistance] in excess of $10,000." 18 U.S.C. § 666.

Cornier raises no issue about the first or third prongs. He argues only that the second prong was not satisfied because his actions fit within a statutory exception. Under § 666(c), "bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business" are exempted from the statute's coverage. § 666(c); see United States v. Mills, 140 F.3d 630, 633 (6th Cir. 1998) ("[B]ona fide salaries, wages, fees, and other compensation either received by or promised by § 666 defendants fall within the scope of the subsection (c) exception"). Subsection (c) was added to the statute in 1986, and the only reference to it in the legislative history states that it "amends 18 U.S.C. § 666 to avoid its possible application to acceptable business practices." H.R. Rep. No. 99-797, at 30 (1986), reprinted in 1986 U.S.C.C.A.N. 6138, 6153.

The facts pertaining to Count One, recounted in the light most favorable to the prosecution, are as follows. CORA Management Group, Inc. was a for-profit private management agency. Cornier, a former PRPHA employee, was the general manager and a shareholder of CORA. Among other things, he was in charge of administering bids for contracting services and obtaining CGP funding for CORA. In July 1995, CORA was awarded a contract with the PRPHA to manage and maintain certain low-income housing projects. Under the

-7-

contract, CORA received federal funds from PRPHA; PRPHA received those funds from HUD. CORA received federal assistance in excess of $10,000 during each of the years 1996-1998 in connection with its management of the housing projects.

Rubin Monroig, a contract employee at PRPHA, approached Cornier in 1995 and informed him that CORA was not requesting from PRPHA any CGP funds. CORA was, of course, receiving a management fee from PRPHA to operate the housing projects. That management fee was paid by PRPHA using federal funds from HUD. But CORA was also entitled to request CGP funds in order to make physical improvements to the public housing projects it operated and in order to improve its management of those projects.[2] Unlike the management fee, which was established under the contract, the disbursement of CGP funds was left to the discretion of PRPHA. Like the management fee, the original source of the CGP money disbursed by PRPHA was HUD. Rubin Monroig told Cornier that his brother, Francisco Monroig, could assist CORA in obtaining CGP funds. Cornier then hired Francisco for that very purpose.

Hiring an expert to assist in handling the paperwork associated with obtaining CGP funds was itself a legitimate use of CGP funds because employing such an expert could improve the

---

[2] Rubin Monroig explained that CGP funds could be used for "permanent improvements . . . such as . . . painting the entire housing project, widening sidewalks, access control, gates and material, basically the most costly items."

management of the public housing projects. Francisco Monroig, however, had absolutely no expertise in or knowledge of CGP funds. Whenever Cornier needed assistance as to CGP funds, he contacted Francisco's brother, Rubin, who did have such knowledge, and Rubin provided the requested assistance. Rubin prepared CORA's requests for CGP funding, which involved creating invoices and associated documentation, and gave them to Francisco. Francisco then delivered the documents to Cornier, who, in turn, submitted them to PRPHA. This was an end-run by Rubin, who could not directly do any of these things because he worked for PRPHA. Francisco did not perform any work at all related to CGP funds.

This case is unusual in that the government made no effort to prove that the underlying work paid for by the HUD monies was not done. Cf. United States v. Moeller, 80 F.3d 1053, 1057-58 (5th Cir. 1996) (sufficient evidence to convict under § 666(a)(1)(A) where, among other things, no written product was ever produced in exchange for state funds). Rubin testified (1) that he did in fact provide the expertise necessary to fill out the paperwork associated with requesting CGP funding for maintenance work, and (2) that the underlying maintenance work -- the work for which he claimed CGP funding was needed in the invoices he prepared for Cornier -- was in fact performed by CORA. However, there was also testimony from Carmen Ortiz, a CORA board member, indicating that Cornier could have done the paperwork himself. Cornier's job,

after all, was to administer the CORA budget and to prepare bids for contracting services. When Francisco's contract "expired," Cornier did in fact prepare the CGP invoices himself. See Mills, 140 F.3d at 633-34 (suggesting that the § 666(c) exception would not apply if the government proved that salaries were paid for jobs that were unnecessary or unjustified).

The government's strategy, it seems, was not to prove that the work was not done, but rather, to prove that the work was done by someone who could not lawfully do it. Rubin worked for PRPHA, and his job was to review the requests for CGP funding from private management agencies such as CORA and to authorize payments of CGP funding to those agencies on PRPHA's behalf. Rubin gave preferential treatment to CORA's requests for federal funding, but it was not proven that those requests would not have been funded anyway. CORA paid Francisco $61,804.80 between September 1995 and February 1997 for the assistance with the paperwork involved in obtaining CGP funds, and Francisco passed the money along to Rubin.

The government's evidence about what Cornier got out of this arrangement was not entirely clear. As best we can tell, this scheme may have somewhat increased CORA's profits in at least two ways. First, CORA's CGP invoices were never rejected. This was important because there was some evidence that the underlying maintenance work needed to be done and that CORA risked losing its management contract if the work was not done. If the CGP invoices

had been rejected, then CORA might have had to pay for the costs of the maintenance work out of its own funds, if the work was done at all. Rubin suggested that the work would not have been done by CORA if CGP funds were not available. According to Rubin, the benefit of the arrangement to Cornier was that CORA "had the benefit of having some work that they needed to be done, having it actually done at a cost which was not going to be charged against their profit, and the company would appear well for having done that work." Second, there was some marginal benefit in that CORA's CGP invoices were processed more quickly.

Whatever the gains to Cornier from the arrangement may have been, they were not trivial because Cornier both lied about and tried to cover up the arrangement. The CORA board was not aware of Francisco's employment. When the board eventually discovered his employment, it confronted Cornier. Cornier falsely told the board that he had hired Francisco because PRPHA had demanded that CORA hire a CGP lobbyist. Francisco only worked about a month after the board's discovery, and Cornier told the board that Francisco's employment had ended because his contract had expired, even though the contract actually had no expiration date.

Cornier argues that his conviction on Count One should be reversed because the payments that he authorized to Francisco Monroig constituted legitimate compensation paid in the usual

course of business and thus fell within the § 666(c) exception. Cornier points out that CGP funds could lawfully be used to hire experts to assist CORA in requesting funds from PRPHA. Further, he maintains that there was no evidence either that he had any knowledge that Rubin Monroig was receiving any part of the payments made to Francisco Monroig, or that he had any knowledge that Rubin, not Francisco, was the one actually doing the work. Without such knowledge, Cornier argues, the payments to Francisco were made in good faith. In other words, Francisco and Rubin may have had a scheme, but he was not part of it.

There was sufficient evidence for the jury to convict. First, the intentionality element of the "intentional misapplication" of federal funds was met by evidence that Cornier in fact knew that Rubin did the work, not Francisco. There was testimony that Francisco was entirely ignorant about CGP funds and that Cornier never even bothered to ask Francisco about them. Francisco testified that he "really didn't know what CGP was" and that the work required by his employment contract with CORA was not performed by him, but rather by Rubin. Francisco explained that he never talked to Cornier about CGP funds and that Cornier never asked him about them. His "limited conversation with [Cornier] pertaining to [the documents he delivered] was, if [Cornier] had any questions regarding the information, [Cornier] should contact my brother Rubin because he was the one who could answer."

-12-

Rubin's testimony was consistent with Francisco's. Rubin acknowledged that Francisco had no knowledge of federal funds and could not have assisted Cornier with them. Rubin testified that "I suppose that [Cornier] knew that Francisco didn't know anything [about CGP funds], because [Cornier] never asked him [about them]." Rubin explained that he himself prepared the invoices for Cornier and that Cornier would contact him, not Francisco, to discuss work related to CGP funds.[3]

Furthermore, Cornier's own behavior belies his contention that he had no knowledge that he was involving CORA in sham contracts with Francisco; it supports the conclusion that he took active steps to conceal the fraud. Cornier met with Francisco behind closed doors, and he never informed the CORA board that Francisco was being employed. When eventually confronted by the board, Cornier first lied about the reason that Francisco was hired and then lied about the termination date of Francisco's contract.

This brings us to the bona fide salary exception in § 666(c), and to Cornier's argument that the payments were not a "misapplication" at all. The jury could easily have concluded that the payments to Rubin through Francisco were not bona fide because the PRPHA conflict of interest rules prohibited Rubin from

---

[3]    Rubin explained that the advantage of using him, someone who worked for PRPHA, was that "because . . . I was the one who was receiving these invoices directly, I would move them with greater speed and they would not be rejected."

-13-

participating in such a scheme. A scheme designed to evade conflict of interest rules is hardly legitimate or acceptable. That the payments were made for a legitimate purpose -- to hire a CGP expert to obtain funding for maintenance work that was indeed done -- does not render them bona fide under the statute if they were intentionally misapplied, as they were here via sham contracts that skirted conflict of interest rules and allowed CORA to receive preferential treatment and other benefits.

This interplay between the bona fide exception and the prohibition against "intentional misapplication" is sensible. As the Second Circuit has explained, the first four prohibitions of § 666(a)(1)(A), embezzlement, stealing, obtaining by fraud, and knowing conversion, "cover any possible taking of money for one's own use or benefit. Intentional misapplication, in order to avoid redundancy, must mean intentional misapplication for otherwise legitimate purposes; if it were for illegitimate purposes, it would be covered by [the first four] prohibitions . . . ." United States v. Urlacher, 979 F.2d 935, 938 (2nd Cir. 1992). The prohibition against intentional misapplication covers the situation presented here: payments made for what was an underlying legitimate purpose but intentionally misapplied to undermine a conflict of interest prohibition. To hold that such payments were bona fide under § 666(c) would be inconsistent with § 666(a)(1)(A).

We affirm the conviction on Count One.

2.  Counts Three, Four, Five, Six, and Seven

To convict Cornier under Count Three,[4] conspiracy to violate 18 U.S.C. § 666, the government had to prove that there was (1) an agreement, (2) an unlawful objective of the agreement (here, violation of § 666), and (3) an overt act in furtherance of the agreement.  United States v. Barker Steel Co., Inc., 985 F.2d 1123, 1127-28 (1st Cir. 1993).

To convict Cornier under Count Four,[5] the government had to prove that Cornier aided and abetted in a violation of 18 U.S.C. § 666, the elements of which were set forth earlier.

To convict Cornier under Count Five,[6] aiding and abetting extortion, 18 U.S.C. § 1951, the government had to prove (1) that Cornier aided the inducement of a victim to part with property; (2) that he did so knowingly and willingly with extortionate means; and (3) that interstate commerce was affected.  See United States v. Stephens, 964 F.2d 424, 429 (5th Cir. 1992).

---

[4]  Count Three charged that, from April 1999 to January 2001, Cornier knowingly and willfully conspired with Juan Irizarry Valentin and Samuel Valentin Toro to violate § 666.

[5]  Count Four charged that, from April 1999 to January 2001, Cornier, an agent of an organization as defined in 18 U.S.C. § 666, along with other such agents, aided and abetted the violation of 18 U.S.C. § 666 by willingly and intentionally embezzling, stealing, obtaining by fraud, converting, or misapplying $266,252.48 that was the property of the PRPHA, an organization that received in excess of $10,000 in a one-year period under a federal program.

[6]  Count Five charged that, from April 1999 to January 2001, Cornier aided and abetted extortion by consenting to a person's receipt of approximately $266,252.48 that was not due to him.

-15-

To convict Cornier under Count Six,[7] money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), the government had to show (1) that Cornier knowingly conducted a "financial transaction," (2) that he knew the transaction involved funds that were the proceeds of some form of unlawful activity, (3) that the funds involved were in fact the proceeds of a "specified unlawful activity," and (4) that Cornier engaged in the financial transaction knowing that it was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of such unlawful activity. See 18 U.S.C. § 1956(a)(1)(B)(i); United States v. Martinez-Medina, 279 F.3d 105, 115 (1st Cir. 2002).

Count Seven[8] charged conspiracy to launder money.

Cornier's appeal of Counts Three through Seven boils down to a single contention -- that he was an innocent victim of extortion by Juan Irizarry Valentin ("Irizarry").

The facts relevant to the remaining counts, described in the light most favorable to the prosecution, are as follows. In 1997, Cornier befriended Irizarry, who was the Director, Operations

---

[7]    Count Six charged that, from April 1999 to January 2001, Cornier aided and abetted the knowing and willful execution or attempted execution of forty-one financial transactions with proceeds from extortion, knowing that the transactions involved unlawful proceeds and knowing that the transactions were designed to conceal those proceeds.

[8]    Count Seven charged that Cornier conspired to commit money laundering related to the offense alleged in Count Six, in violation of 18 U.S.C. § 1956(h).

-16-

Division, Office of Public Housing at HUD in Puerto Rico. Irizarry's job at HUD involved visiting and evaluating the public housing projects that were managed by private management agencies.

In 1998, CORA received a fee for its management and maintenance of certain shelters that were set up by FEMA in the aftermath of the devastation wrought by Hurricane George. Normally, all the CORA partners shared in management fees. When the management fee from FEMA arrived in this instance, however, Cornier took Carmen Ortiz, one of the CORA board members, to see Irizarry at Irizarry's HUD office. Irizarry falsely told Ortiz that the fee could only be divided among the three CORA partners who had actively worked on the shelters. As a result, the management fee was split among Cornier and only two other CORA board members, so Cornier received a larger share than he should have. Irizarry thus lined Cornier's pocket by making a false statement.

Cornier formed his own management agency company, ERCO Enterprises, Inc. ("ERCO") in 1998.[9] Irizarry helped Cornier behind the scenes to incorporate ERCO and then to prepare a bid proposal to PRPHA. Irizarry, a HUD official, did not sit on the PRPHA board that would act on the proposal. The proposal budget set forth the allocation of the money that ERCO planned to spend in managing the requested housing projects. Under the public housing

---

[9] Cornier resigned from CORA in April 1999.

-17-

project system, federal funds paid the salaries of management agency employees assigned to the particular housing projects. In its proposal, ERCO budgeted a generous salary of about $305,000.00 annually for an assistant general manager; the person named was Roberto Colon.

Based on that proposal, PRPHA awarded ERCO a multi-million dollar, five-year contract (April 1999 to March 2004) to manage and maintain certain housing projects. The overall contract was worth $28,676,304.00. There is no evidence that Irizarry influenced the PRPHA to approve the proposal, including its generous salary figure. After the contract was awarded to ERCO, Irizarry arranged for a meeting among Cornier, Samuel Valentin Toro (Irizarry's half-brother, "Valentin") and himself. At that meeting, Irizarry introduced Cornier to Valentin as "your next boss." Cornier offered Valentin an assistant general manager position for $15,000.00 per month ($180,000.00 annually), plus additional incentives. Valentin accepted the offer and was hired to work as an assistant general manager. Cornier's wife, Raquel Rios, was also hired to work as an assistant general manager; she was paid the same salary as Valentin. So, $360,000 a year was being spent on the position of assistant general manager. Roberto Colon, who had been designated as the assistant general manager in the bid proposal, never held the position.

Irizarry then instructed Valentin to open a bank account and to deposit the money from Cornier there each month. Irizarry told Valentin to keep $4,000 each month for himself; it was understood that Irizarry would keep the remaining $11,000. Irizarry received approximately $195,386.36 in payments from Cornier in this way.

Even before Valentin started working for ERCO, Cornier made payments to Irizzary by issuing two checks to Valentin and then endorsing the checks to himself by forging Valentin's signature. Cornier deposited these checks in his own bank account and then wrote out checks to Irizarry from that account for comparable amounts. Cornier also created and signed false employment records for Valentin in connection with the two checks. Irizarry later asked Valentin to imitate the forged signature on future checks.

Cornier argues that he was an innocent victim of extortion by Irizarry and thus entitled to judgment in his favor on each of the remaining counts. As to Counts Three and Four, the government asserts that there is no "innocent victim" defense to a violation of § 666. While some case law suggests that mere acquiescence to an extortioner's demands for payments may not be criminal under 18 U.S.C. § 1951 (extortion), see United States v. Spitler, 800 F.2d 1267, 1275-78 (4th Cir. 1986), Cornier has pointed to no authority, and we have not discovered any, to support

a similar defense to § 666. Cf. Evans v. United States, 504 U.S. 255, 267 n.18 (1992) (extortion and bribery are not necessarily mutually exclusive).

We have already discussed the bona fide exception defense to § 666 liability, and it has no conceivable application to the Irizarry affair. As to Counts Three and Four, then, we take the defendant's "innocent victim" argument as a claim that there was insufficient evidence that he entered into an agreement with Irizarry and Valentin to intentionally misapply funds in violation of § 666.

The government's evidence supporting the existence of an agreement included the following: that Irizarry had helped Cornier to get money while at CORA and then helped him to incorporate ERCO and to prepare a bid proposal for a PRPHA management contract; that the bid proposal included an annual salary of $305,000.00 designated for an assistant general manager named Roberto Colon; that once ERCO was awarded the contract, Valentin, Irizarry's half-brother, was substituted for Colon and paid a salary that even Valentin conceded was grossly inflated; that Valentin gave $11,000 of his monthly salary to Irizarry, who had arranged the meeting among the three men at which Cornier offered Valentin the position; and that Cornier was clearly aware that Valentin was being used to funnel money to Irizarry because even before Valentin began working for ERCO, Cornier "paid" Valentin, falsely endorsed the payments to

himself, and then used the money to pay Irizarry. Based on that evidence, the jury was amply justified in concluding that Irizarry and Cornier had an agreement to submit a bid proposal that included an inflated salary figure for the assistant general manager position, to substitute Valentin for Colon, and to use the inflated salary to channel federal funds to Irizarry. The inflated salary in the bid proposal provided Cornier with the extra federal funds necessary to pay Irizarry, so the jury could logically infer that the men had agreed to include the inflated salary in the bid for that very purpose. That Cornier engaged in the misapplication of funds intentionally is supported by the evidence of his efforts to conceal the scheme -- by channeling the payments to Irizarry through Valentin, by using Roberto Colon's name on the bid proposal, and by signing false employment records in connection with the checks he issued before Valentin started working. We affirm the convictions on Counts Three and Four.

Cornier's "innocent victim" defense is more properly asserted as to Counts Five through Seven because they involve extortion and associated offenses. See Spitler, 800 F.2d at 1276 ("Congress may not have intended to criminalize the acquiescence of extortion victims"); cf. Gebardi v. United States, 287 U.S. 112, 120-23 (1932) (interpreting the Mann Act as not intended to punish the "victim" of the crime).

The defense makes much of the fact that Irizarry pled guilty in another case to conspiring to extort $195,386.36 from Cornier, a fact of which the district court took judicial notice. A victim of extortion can cross the line into illegal behavior if he engages in more active conduct than simply agreeing to pay the extortioner. See Spitler, 800 F.2d at 1276. But here, Cornier argues, Irizarry forced him to hire Valentin for $15,000 per month by using his official position at HUD to threaten Cornier with economic harm, and the evidence shows that he merely acquiesced to the monthly $15,000 payments that Irizarry demanded. He argues that there was no symbiotic relationship between himself and Irizarry and that there is no evidence that he benefitted from or willingly joined in the payments made to Irizarry through Valentin. He emphasizes that Irizarry had nothing at all to do with the approval of ERCO's management contract with PRPHA. Irizarry was a HUD official, and HUD had no input in the awarding of contracts by PRPHA. As a result, he claims, Irizarry's assistance in starting ERCO and in preparing the bid proposal to PRPHA are irrelevant. Put simply, Cornier claims that he got nothing in exchange for the payments he made to Irizarry, thus making unreasonable any conclusion other than that he was an unwilling victim.

To resolve this case, we need not delineate the precise location of the "line at which a payor's conduct constitutes sufficient activity beyond the mere acquiescence of a victim." Id.

at 1278.  Wherever that line is drawn, there was sufficient evidence here to conclude that Cornier was on the wrong side of it.

The fact of Irizarry's guilty plea does not make the evidence of Cornier's own guilt insufficient.  Irizarry's plea was evidence for the jury to consider, and the jury was entitled to conclude, based on the other evidence presented, that Cornier was not an innocent victim at all.

The evidence supported the conclusion that some sort of quid pro quo arrangement was in place and that Cornier did more than merely acquiesce to it.  Irizarry had used his official position at HUD to help Cornier to receive a larger-than-deserved fee from a FEMA program in 1998.  Cornier had taken one of the CORA board members to Irizarry's office to accomplish the fraud.  Later, Cornier would again be the beneficiary of Irizarry's help.  Irizarry provided his experience and expertise in helping Cornier to incorporate his own management company and to prepare a bid proposal to PRPHA.  There is thus no question that Irizarry's help yielded monetary benefits to Cornier, and it would only take a small inference for the jury to conclude that Cornier agreed to the ERCO payment arrangement with Valentin and Irizarry in gratitude for this help.  Valentin explained the scheme in just this way, testifying that he got the assistant general manager job "through my brother, in gratitude for him having helped Mr. Cornier" prepare the bid proposal for the PRPHA contract.  He said, "I had to

believe, and I know for a fact, that he [Irizarry] had a deal with Mr. Cornier."

Moreover, there was testimony that Irizarry and Cornier were great friends. Carmen Santiago, who is Irizarry's ex-wife, testified that Cornier and Irizarry "had a very close relationship" and had been friends since 1997. She said that the two men called each other constantly and that Cornier frequently visited Irizarry at his farm. Valentin's testimony was consistent with Santiago's. He explained that Cornier and Irizarry "had an enormous friendship." Similarly, Carmen Ortiz, a member of the CORA board, testified that "there was a very close friendship between them."

The jury could easily have credited the reinforcing testimony of Santiago, Valentin, and Ortiz and concluded that Irizarry and Cornier were working together, not against one another. The two men looked out for each other and for each other's future. For example, Cornier told Irizarry that if Irizarry ever retired from HUD, Cornier would give him some ERCO shares and have him work for ERCO as a consultant. Cornier and Irizarry often discussed various projects that could be undertaken on Irizarry's farmland. Irizarry constantly advised and counseled Cornier on business matters, and Cornier gave cellular phones to Irizarry. Even if Cornier acted out of friendship for Irizarry, the jury could conclude that there was nothing innocent about it. We affirm the convictions on Counts Five, Six, and Seven.

B. Restitution Order

Cornier appeals the order that he pay $61,804.80 to HUD as restitution in connection with his conviction on Count One. The amount of restitution ordered for Count One is equal to the amount of money paid to Francisco Monroig by Cornier, on behalf of CORA, via the illegal employment scheme. We review restitution orders under an abuse of discretion standard, crediting the lower court's subsidiary factual findings unless clearly erroneous and reviewing associated legal questions de novo. United States v. Vaknin, 112 F.3d 579, 586 (1st Cir. 1997). No facts are in dispute; what is at issue is the viability of the government's theory.

Cornier's argument on appeal appears to be that HUD was not a "victim" for purposes of 18 U.S.C. § 3663 because it suffered no loss attributable to the CGP funds disbursed to CORA and then paid to Francisco Monroig and so HUD was not "directly and proximately harmed." Cornier does not argue that the crime of conviction in Count One is outside the coverage of § 3663, or that the government cannot qualify as a victim under § 3663, United States v. Quarrell, 310 F.3d 664, 677 (10th Cir. 2002). Rather, Cornier asserts that the $61,804.80 in CGP funding was spent by CORA for legitimate purposes and in the ordinary course of business because CGP funds from PRPHA could legitimately be used to pay for expert assistance. He claims that he hired Francisco Monroig in good faith as a funding expert.

-25-

As defined by 18 U.S.C. § 3663(a)(2), a "victim" is

> a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

The district court found that there was a loss, and that HUD was the victim of Cornier's misapplication of federal funds. The court's restitution order was for $136,056.00. On appeal, Cornier challenges only the $61,804.80 that was involved in Count One.

> Cornier argues that:

> as a matter of law there was no loss because the money at issue was, indeed, actually spent by CORA Management for a legitimate purpose, for its own benefit, and in the normal course of business. Indeed, after making the expenditures, CORA['s] performance under the PHA management contract was actually better than if it had not made the expenditures. . . . The inescapable conclusion is that there was no loss to the government because the money was actually spent for what it was suppose[d] to be spent on and the intended beneficiaries (CORA Management and the Project dwellers) received the benefits of the expenditures. In short, there was no victim.

(emphasis omitted). In arguing this, Cornier relies on testimony from the government's own witness, Rubin Monroig, who said that the CGP funds disbursed to CORA represented payment for work that was actually done, including the expert advice that he, Rubin, had provided.

The government's brief is largely non-responsive, arguing instead that the misapplication resulted from the use of

-26-

Francisco's name, that Francisco was no expert, and that Francisco did no work, so there must have been a loss. The government did not try this case on a theory that the work paid for by the CGP funds was never done; there is no testimony to that effect. The government's own witness, Rubin Monroig, said that the underlying work, for which the $61,804.80 was disbursed, was done.

The purpose of restitution is to secure to an identifiable victim who has been directly and proximately harmed the pecuniary loss he or she has suffered. 18 U.S.C. § 3663A(a) and (c). The government's argument confuses the issue whether there has been a crime with the issue whether the conditions for restitution have been met, particularly whether HUD suffered a pecuniary loss. Because the work for which the CGP funds were disbursed was done, it would be an unfair windfall to HUD to conclude that HUD had directly and proximately suffered a loss of $61,804.80. The government offered no evidence of an actual loss to HUD in a lesser amount. Accordingly, we vacate the restitution order to the extent it requires restitution of $61,804.80. See United States v. Paradis, 219 F.3d 22, 24-25 (1st Cir. 2000). We leave the matter of any further proceedings on the restitution count to the district court.

## III.

The convictions are **<u>affirmed</u>**; the order of restitution is vacated to the extent of the $61,804.80 awarded in connection with defendant's conviction on Count One of the indictment.  So ordered.