# United States Court of Appeals
## For the First Circuit

No. 00-1450

UNITED STATES,

Appellee,

v.

ERNESTO JOSE ENCARNACION A/K/A VICTOR MELO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

Before

Boudin, Stahl, and Lynch,
Circuit Judges.

Raymond L. Sanchez Maceira on brief for appellant.
Thomas F. Klumper, Assistant United States Attorney, with whom Nelson Perez-Sosa, Assistant United States Attorney, Jorge E. Vega-Pacheco, Assistant United States Attorney, and Guillermo Gil, United States Attorney, were on brief, for appellee.

February 15, 2001

**STAHL, Circuit Judge**.  Ernesto Jose Encarnacion appeals a district court order denying his motion under Fed. R. Crim. P. 5(a) to dismiss his indictment for the government's alleged failure to bring him before a magistrate judge "without unnecessary delay."  He also appeals his sentence, claiming that the district court should have departed from the Sentencing Guidelines based on the facts of his case.  We affirm.

### I. Background

On January 24, 1999, Encarnacion, a citizen of the Dominican Republic and a convicted felon previously removed from the United States for narcotics-related offenses, attempted to reenter the country through the Luis Munoz Marin International Airport in San Juan, Puerto Rico.  Upon his arrival, a computer check of his passport by officials of the U.S. Immigration and Naturalization Service ("INS") revealed that Encarnacion may have been previously removed for a crime of moral turpitude, and he was detained in an INS facility.  The next day, during an interview with INS Senior Inspector Fernando Ruz-Bulerin ("Ruz"), Encarnacion admitted his previous deportation.[1]  At the end of the interview, Ruz, apparently unaware of the specifics of Encarnacion's criminal history, told Encarnacion that the

---

[1]Before the start of the conversation, Ruz told Encarnacion that the interview was related to Encarnacion's application to enter the United States.

prior order of removal would be reinstated and that Encarnacion would likely be deported. Encarnacion was detained for seven additional days prior to being brought before a federal magistrate judge, a period the government claims it used in order to obtain documents, such as the immigration judge's deportation order, needed to resolve definitively Encarnacion's application to enter the country. As it turned out, upon receiving and reviewing the INS file, Ruz determined that criminal charges, rather than deportation, were warranted in Encarnacion's case, as Encarnacion had previously been convicted of an aggravated felony and had been deported on that basis. See 8 U.S.C. § 1326(b)(2) (prohibiting attempted reentry into the United States by an individual previously deported for an aggravated felony without advance authorization from the Attorney General).

After being indicted, Encarnacion moved to have the charges dismissed on the ground that the eight-day period of detention prior to the probable-cause hearing constituted "unnecessary delay" under Fed. R. Crim. P. 5(a). The district court, in a written memorandum and opinion, found that Encarnacion's detention by the INS was civil in nature, and that Rule 5(a) therefore was inapplicable. United States v. Encarnacion, 56 F. Supp. 2d 151, 159 (D.P.R. 1999).

-4-

Following the district court's decision, Encarnacion and the government entered into negotiations that eventually culminated in a plea agreement. In it, the parties agreed on the appropriate fine and terms of imprisonment and supervised release, and the government pledged to recommend a sentence at the low end of the guideline range. The agreement, however, also stated (and Encarnacion was duly informed at the change-of-plea hearing) that, pursuant to Fed. R. Crim. P. 11(e)(1)(B), the district court ultimately would impose the sentence in accordance with the guidelines, and that the exact terms of the sentence would be left to the sound discretion of the district court. At the sentencing hearing, both Encarnacion and the government requested that the presentence report's ("PSR") Category III criminal-history finding be reduced to Category II. Encarnacion further argued that his was an atypical case warranting departure from the guidelines, notwithstanding the PSR's conclusion to the contrary. Noting Encarnacion's multiple drug offenses before his prior removal, the district court rejected these requests and sentenced Encarnacion to 46 months' imprisonment, a term at the low end of the guideline range produced by the application of a Category III criminal history. Encarnacion also was sentenced to a term of three years'

supervised release, and was ordered to pay a special monetary assessment of $100.

On appeal, Encarnacion challenges the district court's denial of his motion to dismiss the indictment, as well as his sentence.

## II. Rule 5(a) "Unnecessary Delay"

Encarnacion first asserts that the eight-day detention prior to his appearance before a federal magistrate judge was an "unnecessary delay" within the meaning of Fed. R. Crim. P. 5(a), thereby necessitating dismissal of the charges against him. We review de novo the district court's construction of the Federal Rules of Criminal Procedure. United States v. Randazzo, 80 F.3d 623, 627 (1st Cir. 1996).

> Rule 5(a), in relevant part, states:
>
> Except as otherwise provided in this rule, an officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available federal magistrate judge or, if a federal magistrate judge is not reasonably available, before a state or local judicial officer authorized by 18 U.S.C. § 3041.

Attempting to apply this rule to his situation, Encarnacion argues that, from the moment he admitted his prior deportation for an aggravated felony to INS officials, his detention became "criminal" because his admission put the government on

heightened notice that his attempt to reenter the country was unlawful. Accordingly, he claims that his right to a prompt hearing before a magistrate judge was triggered at the moment of his confession, and that he was denied this right by being detained seven additional days prior to the probable-cause hearing. In Encarnacion's view, his eight-day detention was the government's method of holding him for the sole purpose of developing criminal charges against him -- a practice that he claims the government was precluded from utilizing under Rule 5(a).

In response, the government contends that Rule 5(a) has little bearing on Encarnacion since, prior to his appearance before the magistrate judge, his case could not be fairly described as "criminal." The government argues that Encarnacion's arrest and detention were executed according to the civil detention provisions of the immigration laws. See 8 U.S.C. § 1357(a)(2). The upshot of this, according to the government, is that the rights afforded by the Federal Rules of Criminal Procedure attached only after the U.S. Attorney acted on Encarnacion's case. The government further argues that, in this case, the eight-day detention prior to the probable-cause hearing was necessary to secure adequate evidence of Encarnacion's prior deportation, as Encarnacion's confession

standing alone would not suffice to prove the occurrence of those prior events to the magistrate judge. Finally, the government argues that Rule 5(a) was followed to the extent required, in that the U.S. Attorney filed the criminal complaint on the same day that Ruz received Encarnacion's INS file and that Encarnacion received a probable-cause hearing within 48 hours of the filing of the complaint.[2]

Under 8 U.S.C. § 1357(a)(2), INS officials are empowered to perform the warrantless arrest of "any alien who in [their] presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens . . . ." The statute also requires that the detained alien "shall be taken without unnecessary delay for examination before an officer of the [INS] having authority to

---

[2]Following the district court's analysis, Encarnacion argues, and the government seems to agree, that Rule 5(a) incorporates the Fourth Amendment's requirement of prompt determination of probable cause. See Gerstein v. Pugh, 420 U.S. 103, 126 (1975) (holding that the Fourth Amendment requires "prompt" judicial determination of probable cause following a warrantless arrest); County of Riverside v. McLaughlin, 500 U.S. 44, 56-57 (1991) (determining that promptness in this context generally requires that the suspect be brought before the magistrate judge within 48 hours of the warrantless arrest). While the Rule 5(a) and Fourth Amendment contexts are certainly "analogous," Anderson v. Calderon, 232 F.3d 1053, 1104 (9th Cir. 2000) (McKeown, J., dissenting), the 48-hour rule is a requirement of the Fourth Amendment, not Rule 5(a). McLaughlin, 500 U.S. at 56.

examine aliens as to their right to enter or remain in the United States." Id. Although § 1357(a)(2) does not, by its terms, reveal its "civil" or "criminal" character, it is accompanied by a provision authorizing the INS "to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens . . . ." Id. § 1357(a)(4) (emphasis added). Section 1357(a)(4), unlike § 1357(a)(2), does not require that the alien be taken before an INS officer, but rather before "the nearest available officer empowered to commit persons charged with offenses against the laws of the United States . . . ."

In giving distinct meaning to both provisions, courts have read § 1357(a)(2) to apply to arrests of aliens for "status offenses," or immigration-related offenses (such as illegal entry into the United States) that only apply to aliens, while interpreting § 1357(a)(4) to apply to arrests of aliens for "nonstatus offenses," i.e., crimes (such as assault) whose elements could be satisfied by any person, alien or not. Encarnacion, 56 F. Supp. 2d at 154; cf. United States v. Sotoj-Lopez, 603 F.2d 789, 791 (9th Cir. 1979) (per curiam) (finding that § 1357(a)(2) does not encompass arrests and detentions for

nonstatus offenses).[3]  This distinction is crucial to the government's argument, as courts have held, in turn, that Rule 5(a) generally does not protect § 1357(a)(2) civil detainees. United States v. Noel, 231 F.3d 833, 837 (11th Cir. 2000) (per curiam), petition for cert. filed, 69 U.S.L.W. ___ (U.S. Jan. 23, 2001) (No. 00-8139); United States v. Cepeda-Luna, 989 F.2d 353, 358 (9th Cir. 1993); United States v. Valente, 155 F. Supp. 577, 579 (D. Mass. 1957) (Aldrich, J.).

We believe that an offense under 8 U.S.C. § 1326(b)(2) qualifies as a "status offense."  By definition, the act of attempting to reenter the United States as a removed alien without the express consent of the Attorney General is an immigration-related offense that only aliens can commit. Moreover, and more to the point, the INS's primary purpose in investigating Encarnacion was, from the beginning, civil.  Even though the documents contained in Encarnacion's INS file ultimately served as the catalyst for the filing of felony charges, the reason that the INS retrieved the file in the first place was to act on what they thought was a simple reinstatement

---

[3]Encarnacion cites Sotoj-Lopez in support of the proposition that Rule 5(a) should apply to his arrest and detention.  In that case, however, the Ninth Circuit found that "section 1357(a)(2) relaxed Rule 5(a) . . . for the examination of an alien's right to remain in the United States" and that the INS need comply with Rule 5(a) only "if the alien is being charged with a non-status offense."  603 F.2d at 791.

of the prior removal order -- a civil matter. Upon receipt of Encarnacion's file, however, Ruz learned for the first time of Encarnacion's prior aggravated felonies, a discovery that caused him to change the treatment of the case from a deportation matter to a referral of possible criminal activity to the U.S. Attorney. It is in this context that Encarnacion was arrested and subsequently detained under the civil authority of 8 U.S.C. § 1357(a)(2).

Furthermore, we do not believe that Encarnacion's civil detention was a pretext for holding him in order to develop other criminal charges, nor do we find that his admission of illegal entry to INS officials transformed his case from a civil case to a criminal one. From the moment he was stopped at the San Juan airport, the INS was required by law to determine whether Encarnacion's application to enter the country was valid, and to this end, it immediately put into motion the administrative process of determining Encarnacion's status. His interview with Ruz, mandated by the "taken without unnecessary delay . . . before an officer of the [INS]" language of § 1357(a)(2), amplified the INS's suspicions that Encarnacion's attempted entry was unlawful. But only after receiving the INS file on Encarnacion containing the prior deportation order had Ruz secured the "probable cause" necessary to initiate the

criminal process under the applicable law and regulations. See Mountain High Knitting, Inc. v. Reno, 51 F.3d 216, 218 (9th Cir. 1995) ("[A]lthough the lack of documentation or other admission of illegal presence may be some indication of illegal entry, it does not, without more, provide probable cause of the criminal violation of illegal entry.") (emphasis added) (quoting Gonzales v. City of Peoria, 722 F.2d 468, 476-77 (9th Cir. 1983)); 8 C.F.R. § 241.8(a)(1) (requiring INS officers to obtain prior order of deportation in determining whether reinstatement-of-removal order is appropriate). Consequently, Encarnacion's case did not become criminal until Ruz's contact with the U.S. Attorney, and after that point, Encarnacion was brought expeditiously before the federal magistrate judge.

Certainly, in most cases, prompt action by INS officials (and the availability of today's parcel-delivery services) should make it possible to transmit files between INS offices more quickly than seven days. Here, however, Encarnacion has presented no evidence (nor do we find any in the record) indicating that his detention was a dilatory tactic employed by the government for some impermissible purpose.[4]

_____

[4]Like the district court, we acknowledge that the difference between civil and criminal detentions may appear formalistic, and that in practical terms an unnecessarily long detention under civil law is no better for the detainee than one under the criminal law. We have held that aliens in Encarnacion's

-12-

Having determined that Encarnacion's arrest and detention were civil and nonpretextual, we have little trouble holding that Rule 5(a) did not render his eight-day detention unlawful. We agree with the Eleventh and Ninth Circuits' respective holdings in Noel, 231 F.3d at 837, and Cepeda-Luna, 989 F.2d at 358, that Rule 5(a) is inapplicable to civil deportation arrests and detentions under 8 U.S.C. § 1357(a)(2). Accordingly, we affirm the district court's denial of Encarnacion's motion to dismiss the indictment.[5]

## III. Application of the Sentencing Guidelines

Encarnacion's other argument is that the district court erred in rejecting the joint request under the plea agreement to

---

situation who are unlawfully detained may petition for habeas corpus relief under 28 U.S.C. § 2241, even after the passage of the Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, 110 Stat. 3009 (1996). Mahadeo v. Reno, 226 F.3d 3, 10 (1st Cir. 2000), petition for cert. filed, 69 U.S.L.W. 3418 (U.S. Dec. 11, 2000) (No. 00-962).

[5]Several courts have held that in cases where an unnecessary delay before the probable-cause hearing is not used to subject defendant to unwarranted interrogation, Rule 5(a) does not provide a basis for dismissal of the indictment because defendant cannot be said to have been prejudiced by the delay. United States v. Morrison, 153 F.3d 34, 56 (2d Cir. 1998); United States v. Nazarenus, 983 F.2d 1480, 1482-83 (8th Cir. 1993); Lovelace v. United States, 357 F.2d 306, 310 (5th Cir. 1966). In light of our determination that Rule 5(a) does not apply to Encarnacion's civil detention, we need not decide whether Rule 5(a) can ever be a basis for dismissal of an indictment absent evidence of unwarranted interrogation during the period of detention.

lower his criminal-history category, and in refusing to depart from the guidelines based on the "atypical" facts of his case. On this later point, he claims that his attempted reentry into the United States was merely an attempt to be reunited with his wife and children (who reside in this country) and that he possesses a sincere desire to enter drug rehabilitation so that he may take better care of his family. This type of argument, however, is squarely foreclosed by the guidelines themselves. As we have frequently held, a district court's refusal to depart from the guidelines may not be reviewed unless the court misconstrued its legal authority to depart. See, e.g., United States v. Savinon-Acosta, 232 F.3d 265, 268 (1st Cir. 2000). In this case, the district court did not misapprehend its legal authority under the guidelines; its decision not to depart rested solely on its reasonable assessment of the facts of Encarnacion's case. Thus there is no basis to disturb the sentence imposed by the district court.

**Affirmed.**