UNITED STATES of America,
Plaintiff(s)

v.

Leonardo HILARIO HILARIO, Kennedi
Martinez, Fernando Jose Milan, Del-
gadino Peguero, Santiago Rodriguez,
Defendant(s).

No. Crim 04–405(JAG).

United States District Court,
D. Puerto Rico.

June 28, 2005.

Jacabed Rodriguez–Coss, Dina Avila–Jimenez, United States Attorney's Office, San Juan, PR, for Plaintiffs.

David Ramos–Pagan, Cardona, Ramos & Assoc., San Juan, PR, Michael S. Corona–Munoz, Guaynabo, PR, Olga M. Shepard–De–Mari, Juan J. Hernandez–Lopez–de–Victoria, Hernandez Lopez de Victoria Law Office, Eric M. Quetglas–Jordan, Quetglas Law Office, San Juan, PR, for Defendants.

**1.** The grand jury issued the original indictment on December 8, 2004 (Docket No. 17).

**2.** The indictment was further superseded on May 17, 2005 to charge Peguero with two counts of violations to 18 U.S.C.

## OPINION AND ORDER

GARCIA–GREGORY, District Judge.

On March 30, 2005, a Grand Jury returned a superseding indictment[1] charging defendants Leonardo Hilario Hilario ("Hilario"), Kennedi Martinez ("Martinez"), Fernando Jose Milan ("Jose–Milan"), Delgadino Peguero ("Peguero"), and Santiago Rodriguez ("Rodriguez")("collectively defendants") with violations to 8 U.S.C. §§ 1324(a)(1)(A)(i) & (v)(II) and 1324(a)(1)(B)(iii); to wit, bringing and attempting to bring to the United States, by use of an unseaworthy and overcrowded yawl which placed in jeopardy the lives of the aliens and for private financial gain and profit, approximately eighty-seven (87) aliens, knowing that said persons were aliens, at a place other than a designated port of entry, and at a place other than as designated by the Commissioner of Immigration and Naturalization, regardless of whether such aliens have received prior official authorization to come to, enter, or reside in the United States and regardless of any future action which may be taken with respect to such aliens; violations which resulted in seven deaths (Docket No. 179).[2] Pending before the Court are defendants' motion to suppress photo line-up (Docket No. 198); Martinez's, Hilario's, and Peguero's motions to sever (Docket Nos. 200, 203, 205); Peguero's motion to dismiss the indictment (Docket No. 204); and Peguero's motion to suppress his post-arrest statements (Docket No. 206). For the reasons discussed below, the Court **DENIES** defendants' motion to suppress the photo line-up; **DENIES** Martinez's,

§ 1512(a)(2)(A) & 1512(b)(1); to wit, threatening the use of physical force against two witnesses with the intent to influence, delay, or prevent their testimony in an official proceeding (Docket No. 213).

Hilario's, and Peguero's motions to sever; **DENIES** Peguero's motion to dismiss; and **DENIES** Peguero's motion to suppress his post arrest statements.

### FACTUAL BACKGROUND[3]

During the late night hours of Wednesday, December 1, 2004, sometime between midnight and one o'clock in the morning, a wooden yawl, measuring approximately 40 × 5 feet and carrying approximately ninety-two passengers, left the Dominican Republic for the United States, specifically Puerto Rico. The trip lasted approximately thirty hours.

On December 3, 2004, in the early morning hours, the aerial division of the Fuerzas Unidas de Rapida Accion ("FURA") of the Puerto Rico Police Department ("PRPD"), detected the yawl near the northern coast of Puerto Rico. FURA agents contacted the Customs and Border Protection Office in Aguadilla, Puerto Rico, to alert them about the yawl. Shortly thereafter, FURA agents informed the Border Patrol that they had lost contact with the yawl. Border Patrol agents then initiated land surveillance of the areas adjacent to Arecibo.

At approximately 7:00 a.m., Border Patrol agents were informed that the yawl had capsized in the Cerro Gordo beach area and that the United States Coast Guard and FURA were already on the scene engaged in a rescue operation. Immigration and Customs Enforcement ("ICE")—SAC San Juan Duty Special Agent Horacio Amador received a call from Border Patrol who informed him that PRPD agents had approximately forty Dominican Nationals in custody. ICE agents responded to the scene and discovered that the number of illegal aliens in custody was actually eighty-five. In addition, the Coast Guard and PRPD reported seven casualties.

Immediately upon reaching land, some of the rescued aliens began identifying the captains of the yawl by pointing at them. Many blamed the captains for the yawl having capsized; some believed the captains had capsized the yawl intentionally and were eager to point them out to the authorities.

Special Agent Ricardo Nazario of the ICE remembers having spoken to at least two such aliens. Based in part on the information provided by these witnesses, and in part on the information provided by other unidentified aliens at the scene, five of the aliens rescued were separated from the group and transported to the General Services Administration ("GSA") facility located in Guaynabo, Puerto Rico. These five aliens, who were later indicted for the alien smuggling, were kept separate at all times. No show ups of any other suspects was done. No further investigation was conducted at the time since the authorities were more concerned with giving first-aid to the rescued aliens.

Subsequently, members of the law enforcement agencies who responded to the scene assisted in the transportation of the aliens to two different locations: approximately half were transported to the GSA facility, and the other half to ICE's San Patricio offices. One of the aliens was transported to the hospital and admitted for treatment due to second-degree burns on his body caused by gasoline exposure. PRPD agents took custody of the seven bodies of those aliens who perished during the failed human smuggling venture.

At the GSA facility, the aliens were provided with food, dry clothes, and the opportunity to shower. Subsequently, they

---

**3.** The relevant facts are taken from the Government's opposition to defendants' motion to suppress (Docket No. 231)

were transported to ICE's San Patricio offices for processing, which entailed photographing, fingerprinting, and the completion of a number of administrative immigration forms. Once the aliens were processed, the agents distributed a questionnaire in order to determine which aliens were willing to cooperate with law enforcement authorities. A total of forty-nine aliens agreed to identify those among the yawl passengers who were responsible for the smuggling venture.

Because of the large number of aliens, agents began to assemble a photo line-up with the photographs of all aliens rescued. This was done in the order in which they were processed. At some point, the Assistant U.S. Attorneys assigned to the case instructed the agents to include only the male passengers in the photo line-up since there was no information indicating that there were any female captains.[4] The photo line-up was completed containing the pictures of all the male passengers rescued in order to identify the captains and/or organizers of the failed smuggling venture. The photo line-up contained fifty-eight photographs (because alien number fifty-eight was the last to be processed), with nine photographs per page, except for the last page, which contained only four. This photo line-up was shown to all of the forty-nine passengers who indicated a willingness to cooperate with authorities. As a result, thirty-seven identified defendant Hilario, twenty-seven identified Martinez, thirty-five identified Milan, forty identified Rodriguez, and nineteen identified Peguero as the captains of the yawl.

## DISCUSSION

A. *Defendants' Motion to Suppress the Photo Line–Up*

Defendants argue that the photospread presented to the witnesses in this case in order to identify the captains of the yawl was impermissibly suggestive and should be suppressed.

The Supreme Court has "fashioned a two-pronged test for the exclusion of identifications based upon impermissibly suggestive procedures. The first prong involves determination of whether the identification procedure was impermissibly suggestive." *United States v. Maguire*, 918 F.2d 254, 263 (1st Cir.1990)(citing *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). "The second prong ..., invoked only when a photospread has been deemed impermissibly suggestive, measures the reliability of the identification based on the totality of the circumstances according to a five-point index...." *Id.* The factors to be considered are "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

█ In applying the first prong of this test, and after close examination of the photospread, the Court cannot find that it is suggestive, much less impermissibly so. The photospread is composed of fifty-eight color photographs, of both men and women, all aliens who traveled onboard the yawl. Some of the pictures look more like mug-shots than others, but those do not show any of the defendants. That it contained a large number and variety of pictures is certainly indicative of its reliability.

4. The photo spread, however, does include nine pictures of female aliens.

Defendants argue, however, that the photospread is suggestive because it did not contain pictures of all the yawl's passengers and because their pictures were grouped together as the last five on the photospread, four of them as the only pictures on the last page. Although the Government does not offer an explanation as to why not all the aliens were included in the photospread, it does proffer that the reason why the defendants' pictures are at the end is simply because the pictures were placed in the order in which the aliens were processed and the defendants were the last to be processed. Looking at the photospread as a whole, and considering the totality of the circumstances, the Court cannot find merit in defendants' argument.

Even assuming *arguendo* that the Court were to find the photospread suggestive, application of the second prong of the test would render the witness identifications reliable nevertheless. The witnesses spent at least thirty hours in close proximity to the defendants on board a forty by five foot vessel. Furthermore, once they had reached land many of the witnesses began pointing to the defendants as those responsible for the smuggling venture and the yawl's capsizing. Furthermore, the photospread was shown to them on the same day of their rescue, that is only a few hours after they were last in close proximity with the defendants. Even if, as defendants contend, the Government separated the five defendants from the rest and "paraded" them in front of the other detainees before they were identified from the photospread, the witnesses had more than sufficient opportunity to see the captains of the yawl.

Therefore, after considering all these factors and the facts of this case, the Court finds that the witness identifications are reliable and defendants' motion to suppress must be denied.

### B. *Motions to Sever*

Martinez, Hilario, and Peguero move to sever their trial from co-defendant Jose–Milan's because the latter gave statements to the Government in which he admits to his participation in the smuggling venture and incriminates his co-defendants.

■ In this Circuit, "[a]s a rule, persons who are indicted together should be tried together." *United States v. O'Bryant,* 998 F.2d 21, 25 (1st Cir.1993)(*citing Zafiro v. United States,* 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993)). "Thus, when multiple defendants are named in a single indictment, a defendant who seeks a separate trial can ordinarily succeed in obtaining one only by making a strong showing of evident prejudice." *Id.* (*citing United States v. Martinez,* 922 F.2d 914, 922 (1st Cir.1991); *United States v. Boylan,* 898 F.2d 230, 246 (1st Cir.)). Moreover, the Supreme Court has stated that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933.

■ First, defendants argue, that if in a joint trial Jose–Milan's incriminating extra-judicial statements are admitted they will be precluded from cross-examining him in relation to those statements. The issue of the extrajudicial statements, however, has already been settled. In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that the extrajudicial statements of a non-testifying defendant, which incriminate the declarant as well as his co-defendants, is only admissible against the declarant and their admission at a joint trial violates the co-defendants' right to cross-examination secured by the Confrontation Clause of the Sixth Amendment.

*See Id.* at 126, 88 S.Ct. 1620; *see also United States v. Vega Molina,* 407 F.3d 511, 518–19 (1st Cir.2005)("It is well-established that the out-of-court statements of a non-testifying defendant, even if admissible against the declarant, may not be used against a jointly tried codefendant unless otherwise independently admissible against that codefendant."). In order to avoid any possible *Bruton* problems,

> "a defendant's out-of-court statements sometimes may be introduced at a joint trial, provided that (i) the district court instructs the jury not to consider the statements against any defendant other than the declarant and (ii) the statements are not so powerfully inculpating of the other defendants that there would be substantial doubt as to whether the jury could abide by a limiting instruction."

*Vega Molina,* 407 F.3d at 519 (*citing Bruton,* 391 U.S. at 135–37, 88 S.Ct. 1620). "Under this paradigm, a defendant's out-of-court confession generally will be admitted if it is redacted to delete the codefendant's name and any reference, direct or indirect, to his or her existence." *Id.* (*citing Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)).

Accordingly, the proper remedy in this situation is to simply redact the non-testifying defendant's statements in order to remove any reference, direct or indirect, to his co-defendants. A review of Jose–Milan's statements in this case reveals that they can easily be redacted in such a way that they will not cause any prejudice to his co-defendants.

■ Second, defendants assert that they would be precluded from offering Jose–Milan as a defense witness. Their theory seems to be that they were merely passen-

gers on the vessel and that Jose–Milan along with the "real captains", who are among the Government's witnesses, are pointing fingers at them in order to escape punishment. Thus, by calling Jose–Milan as a witness, they claim that the true identities of these so called "real captains" may be revealed. This because, as they understand it, Jose–Milan gave conflicting statements to the authorities.[5]

A review of the statements, however, clearly reveals that Jose–Milan's conflicting statements only relate to his own participation in the smuggling venture. More specifically, in his first statement he denied any involvement but later confessed when confronted with the statements of other witnesses. His identifications of the others involved were not contradictory. In his first statement Jose–Milan identified Peguero, Martinez, and Rodriguez as the captains of the yawl. In his second, after admitting to his participation he again named Peguero, Martinez, and Rodriguez and further incriminated Hilario as the one more actively giving instructions. The Court, thus, does not find that presenting Jose–Milan as a defense witness would help their case. On the contrary, Jose–Milan's statements have been consistent as to his co-defendants' involvement.

Therefore, the Court finds that defendants have not surpassed the high burden justifying a severance and their motions seeking this remedy must be denied.

C. *Peguero's Motion to Dismiss the Indictment*

Fed.R.Crim.P. 5(a) requires that when arrested, the defendant must be taken before a Magistrate–Judge without unnecessary delay. The Supreme Court has held that a "determination[ ] of probable cause

---

**5.** It should be noted that defendants' counsel admit they had not seen Jose–Milan's state-

ments prior to filing their motions.

within 48 hours of arrest will, as a general matter, comply with the promptness requirement...." *See County of Riverside v. McLaughlin*, 500 U.S. 44, 56, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991).

■ Peguero argues that the indictment against him must be dismissed because the seventy-two (72) hour delay between his warrantless arrest and his initial appearance before a Magistrate–Judge, absent extraordinary circumstances, violated his Fourth Amendment rights. Peguero asserts that he was arrested on December 3, 2004, but was not taken before a Magistrate–Judge until December 6, 2004.

The Government argues that Peguero was not under criminal arrest until December 6. Since December 3, Peguero, and the rest of the aliens were under an administrative detention pending deportation proceedings. It was only after the investigation had focused on the five defendants here indicted that, on December 4, a criminal complaint was filed and approved by a Magistrate–Judge. Pursuant to that complaint, the defendants were arrested on December 6 and promptly brought before the Magistrate–Judge for a determination of probable cause on that same day.

■ Peguero, however, relies on *United States v. Encarnacion*, 239 F.3d 395 (1st Cir.2001), to argue that because he was ultimately charged with a violation to 8 U.S.C. § 1324, a non-status offense,[6] the administrative detention violates Fed. R.Crim.P. 5(a). His argument fails, however, because, even if he was ultimately charged with a non-status offense, he was originally detained on December 3 for a determination of whether he was committing a status offense, such as illegal entry into the United States, which is considered civil in nature and does not trigger Fed.

R.Crim.P. 5(a)'s forty-eight hour requirement. *See Id.* at 399–400 ("Having determined that Encarnacion's arrest and detention were civil and nonpretextual, we have little trouble holding that Rule 5(a) did not render his eight-day detention unlawful. We agree ... that Rule 5(a) is inapplicable to civil deportation arrests and detentions....").

Accordingly, the forty-eight hour period did not begin to run on December 3, but rather on December 4 when the criminal complaint was approved by the Magistrate–Judge. It is only at that point that it can be understood that Peguero was detained for a criminal non-status offense. Because he was taken before the Magistrate–Judge within forty-eight hours from the approval of the criminal complaint, Peguero's motion to dismiss must be denied.

D. *Peguero's Motion to Suppress Post–Arrest Statements*

■ Shortly after midnight on December 5, 2004, Peguero was brought into a cubicle space in ICE's facilities, where he was interviewed by two agents, one who asked the questions and one who simply took notes. Peguero was not handcuffed at the time. According to the Government, the interviewing agents were sitting and were not brandishing weapons. Peguero was advised of his constitutional rights, both in writing and orally, in his native Spanish language. After stating that he understood his rights, Peguero signed a Waiver of Rights Form and provided agents with a statement, although neither party has revealed the contents of the statement. Peguero now seeks suppression of that statement.

The only basis asserted by Peguero for suppression is that the statement was ob-

---

6. A "status" offense is an immigration related offense that only applies to aliens. A "non-status" offense is a crime whose elements can be satisfied by any person, alien or not. *See Encarnacion*, 239 F.3d at 398.

tained at 1:00 a.m. during a seventy-two hour delay between his arrest and his initial appearance before a Magistrate–Judge and without the assistance of counsel. This is, however, insufficient grounds for suppression.

The Court is unaware of any limitation on the time of day or night that government agents are allowed to interview suspects in custody. Furthermore, the Court has already discussed and denied the argument that there was an impermissible delay between Peguero's arrest and his initial appearance. Thus, no viable basis has been proffered by Peguero to warrant suppression of his post-arrest statements and his motion must be denied.

## CONCLUSION

For the aforementioned reasons, the Court **DENIES** defendants' motion to suppress the photo line-up; **DENIES** Martinez's, Hilario's, and Peguero's motions to sever; **DENIES** Peguero's motion to dismiss; and **DENIES** Peguero's motion to suppress his post arrest statements.

IT IS SO ORDERED.