# United States Court of Appeals
## For the First Circuit

No. 18-1350

UNITED STATES,

Appellee,

v.

MARIO ERNESTO GARCIA-ZAVALA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Circuit Judge,
Souter,* Associate Justice,
and Kayatta, Circuit Judge.

Robert C. Andrews, with whom Robert C. Andrews Esquire P.C.
was on brief, for appellant.
Julia M. Lipez, Assistant U.S. Attorney, with whom Halsey B.
Frank, U.S. Attorney, was on brief, for appellee.

March 25, 2019

_____

* Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**LYNCH**, **Circuit Judge**.  This case concerns the denial of pretrial motions brought by a defendant attacking his conviction for illegal reentry after removal from the United States.

Mario Ernesto Garcia-Zavala was a passenger in a van stopped in Maine for seatbelt violations.  The Maine State Trooper conducting the stop spoke with the driver and passengers, several of whom did not appear to be wearing their seatbelts or to speak English.  The Trooper contacted an Immigration and Customs Enforcement (ICE) Officer for help identifying the passengers.

When asked for his identification, Garcia-Zavala produced a consular ID card.  An ICE Officer ran that ID through ICE databases and determined that Garcia-Zavala was suspected of illegal reentry.  When ICE officers arrived at the scene, they placed Garcia-Zavala in administrative custody.  Thirteen days later, he was charged with one count of illegally entering the United States after removal, in violation of 8 U.S.C. § 1326(a), and made his initial court appearance. Garcia-Zavala was convicted after a bench trial.

His appeal essentially raises two issues: (1) whether the district court erred in not dismissing his indictment for delay in presentment, in violation of Federal Rule of Criminal Procedure 5(a), and (2) whether the district court erred in not suppressing information that law enforcement had gathered about him, including his identity.

We affirm the district court's denial of Garcia-Zavala's motion to dismiss and motion to suppress.

                                    I.

The district court helpfully detailed a minute-by-minute account of the traffic stop. United States v. Garcia-Zavala, 2018 WL 1091973, at *1-4 (D. Me. Feb. 28, 2018). We summarize that account here.

On September 9, 2017, Maine State Trooper Robert Burke III observed a van whose front-seat passenger appeared not to be wearing a seatbelt, a violation of Maine law. Id. at *1 (citing Me. Stat. tit. 29-A, § 2081(3-A)). Burke pulled the van over at 12:20 p.m. and asked the driver for identification. Id. He then moved to the other side of the van to ask the passengers questions. Id. After receiving minimal responses, Burke asked if anyone in the van spoke English. Id. Burke remarked that several passengers did not appear to be wearing seatbelts and did not seem to speak English. Id.

Burke returned to his car and called Elliot Arsenault, an ICE Deportation Officer. Id. at *2. Burke told Arsenault that he had stopped a van for a seatbelt violation and that he thought Arsenault should "come out" because he believed that the stop would "lead to people from out of this country." Id. Burke said that he intended to issue tickets for seatbelt violations, so he needed ICE assistance in identifying the van's occupants. Id. Arsenault

                                  - 3 -

asked Burke to get any consulate ID cards or other means of identification, so Burke did.  Id.

The driver produced a Mexico consular ID card.  Id.  Some of the other passengers produced consular ID cards, including Garcia-Zavala, who had a Honduran consular ID card.  Id.  Burke told the van occupants that they were not free to leave, returned to his vehicle, and sent photographs of the ID cards to Arsenault.  Id.  And because the van's driver was unlicensed, Burke also tried to determine whether any of the van passengers had a valid driver's license to allow one of them to drive the van from the scene.  Id.

Trooper Jason Cooley soon arrived.  Id.  He and Burke spent the next several minutes inspecting the IDs.  Id.  Since none of the van's occupants produced a driver's license, Burke asked dispatch to call a tow truck to the scene.  Id.

By 12:41 p.m., just over twenty minutes after the stop had begun, Arsenault had determined that Garvia-Zavala was suspected of reentry after removal.  Id.  He communicated that information to ICE Officer John Lenotte, who was in Maine and available to go to the scene.  Id.  Arsenault also sent the reentry information to Burke.  Id.  Burke replied that there was time for ICE Officers to make it to the scene because he intended to arrest the driver of the van for driving without a license and to have the van towed.  Id.

Burke explained to the van's occupants that he intended to write each of them a ticket for failing to wear a seatbelt, that this would take about half an hour, and that they would have to wait for the tickets.  Id. at *3.  He returned to the van with the first ticket about five minutes later.  Id.

When the tow truck arrived at 1:19 p.m., Burke told its driver that they would wait for ICE Officers to arrive before towing the vehicle.  Id.  The first ICE Officer, Patrick Mullen, arrived on the scene about twenty minutes later.  Id.  Lenotte soon followed.  Id.  Both ICE Officers knew from Arsenault that Garcia-Zavala was subject to detention for illegal reentry.  Id.

Without administering a Miranda warning, Lenotte asked Garcia-Zavala for his name and date of birth.  Id.  In response, Garcia-Zavala provided answers matching the information on the Honduran consular ID card previously given to Burke.[1]  Id.

ICE officers took Garcia-Zavala into administrative custody and transported him to an ICE office for booking.  Id.  The district court found this was ICE's "standard process."  Id.  Fingerprints and additional record checks conducted at the office confirmed that Garcia-Zavala had been removed from the United States in 2014.  Id.  After the booking was complete, Garcia-

---

[1]    Garcia-Zavala also admitted to Lenotte that he was in the country illegally.  The government committed not to introduce this statement at trial.  Id. at *3 n.9.

Zavala was transported to Cumberland County Jail, where ICE paid to house him.  Id.

On Monday, September 11, 2017, Lenotte transported Garcia-Zavala from the jail back to the ICE office.  Id. at *4. He administered a Miranda warning with the aid of an interpreter. Id.  Garcia-Zavala invoked his right to remain silent.  Id. Lenotte then returned him to the jail.  Id.

Lenotte received Garcia-Zavala's alien file (A-file) on Friday, September 15, 2017.  Id.  By the following Monday, September 18, 2017, Lenotte had sent the necessary paperwork to the U.S. Attorney's Office with a recommendation for criminal prosecution, which the U.S. Attorney's Office accepted.  Id.  The office prepared a criminal complaint against Garcia-Zavala and presented it to a Magistrate Judge on September 19, 2017.  Id. That same day, a criminal arrest warrant was issued for Garcia-Zavala, who remained in custody at the Cumberland County Jail. Id.

Garcia-Zavala made his initial appearance on September 22, 2017 and, on that same day, was transferred to the custody of the U.S. Marshal.  Id.  Garcia-Zavala was in custody for thirteen days before making his initial appearance.  Id.

Garcia-Zavala moved to dismiss his indictment, claiming that the government violated Federal Rule of Criminal Procedure 5(a) by unnecessarily delaying his initial appearance on a pending

charge.  He also moved to suppress his identity, his consular card, his fingerprint card, his A-file, and statements he had made to Lenotte.

The district court denied the motion to dismiss, finding no Rule 5(a) violation, and concluding that, in the alternative, dismissal was not the appropriate remedy for a presentment delay. Id. at *5.  The district court denied the motion to suppress because the traffic stop did not violate Garcia-Zavala's rights, the stop was not unduly lengthy, and identity information is not subject to suppression.  Id. at *5-8.

The district court also, despite Garcia-Zavala's arguments otherwise, found no "factual support" for the assertion "that the stop was racially motivated."  Id. at *5.

This appeal followed.[2]

## II.

### A.  Motion to Dismiss

We review the district court's legal conclusions de novo, its factual findings for clear error, and its "ultimate

---

[2]    Though the government states that "Garcia-Zavala has completed serving his term of imprisonment and likely has been deported," the appeal is not moot.  Collateral legal consequences flow from the challenged conviction. See, e.g., United States v. Marsh, 747 F.2d 7, 9 n.2 (1st Cir. 1984) (concluding that although all defendants had completed their jail time and been deported, their record of conviction constituted a continuing harm, so their appeals were not moot).

ruling" for abuse of discretion.  United States v. Doe, 741 F.3d 217, 226 (1st Cir. 2013) (internal quotation marks omitted).

Garcia-Zavala's argument is that the government violated Federal Rule of Criminal Procedure 5(a) by unnecessarily delaying his initial appearance on a pending charge.[3]  Rule 5(a) requires a "person making an arrest within the United States [to] take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise."  Fed. R. Crim. P. 5(a)(1)(A).  But Rule 5(a) does not generally apply to civil detainees.  See United States v. Encarnacion, 239 F.3d 395, 398-99 (1st Cir. 2001).  We agree with the district court that there was no Rule 5(a) violation here.  Garcia-Zavala, 2018 WL 1091973, at *5.

Garcia-Zavala was held in civil ICE detention until the day of his initial appearance.  Garcia-Zavala was detained on suspicion of having illegally reentered the United States, in violation of 8 U.S.C. § 1326.  Illegal reentry is a civil "status offense that does not trigger the protections of Rule 5(a) until the criminal process has been initiated against the detained alien."  United States v. Tejada, 255 F.3d 1, 3 (1st Cir. 2001);

---

[3]     In his motion to dismiss, Garcia-Zavala raised a claim under the Speedy Trial Act (STA), 18 U.S.C. § 3161(b).  He has waived any such claim on appeal for lack of developed argumentation.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

see Encarnacion, 239 F.3d at 399. So ICE's administrative custody of Garcia-Zavala beginning on September 9, 2017, was civil, not criminal.

We have conjectured that Rule 5(a) may apply when "the government uses civil detention as a pretext for holding an individual while it investigates other possible criminal charges." Tejada, 255 F.3d at 4 (not involving such evidence of pretext). Garcia-Zavala argues that this is such a case. He argues that, thirty minutes into the stop, it was already clear that he would be criminally charged, so the Rule 5(a) "unnecessary delay" analysis should begin there. But the district court found no evidence that Garcia-Zavala was "detained for any reason other than routine inquiry into his suspicious immigration status -- a civil matter." Garcia-Zavala, 2018 WL 1091973, at *4 (quoting Tejada, 255 F.3d at 4). And the district court found no evidence that the government employed "delaying tactics for an impermissible purpose." Id. (quoting Tejada, 255 F.3d at 5). Rather, Officer Lenotte followed the course laid out in Tejada and Encarnacion: He promptly obtained a hard copy of Garcia-Zavala's immigration A-file, confirmed the previous deportation order, and then presented the case to the U.S. Attorney's Office for criminal charges. See Tejada, 255 F.3d at 2; Encarnacion, 239 F.3d at 396-97. Based on our review of the record, we find no clear error with the district court's factual findings.

Garcia-Zavala only entered criminal custody on September 22, 2017, when ICE officials brought him to the courthouse for his initial appearance. Because Garcia-Zavala made his initial appearance just as "the criminal process [was] initiated," Tejada, 255 F.3d at 3, there was no "unnecessary delay" before his initial appearance and so no Rule 5(a) violation.[4]

B.   Motion to Suppress

Garcia-Zavala moved to suppress his identity, his consular ID card, his fingerprint card, and his A-file. We affirm the denial of Garcia-Zavala's motion to suppress this evidence for the reasons stated by the district court, id. at *5-7 (part II.B.1 through II.B.2), and do not reach its identity information ruling, id. at *7-8 (part II.B.3).

Garcia-Zavala also moved to suppress his unwarned statements to Lenotte. When questioned by Lenotte during the roadside stop, Garcia-Zavala identified himself and provided his date of birth and country of origin. Garcia-Zavala argues that this information was obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966), and that this violation warrants suppression.[5]

---

[4]   Because there was no Rule 5(a) violation, "we need not decide whether Rule 5(a) can ever be a basis for dismissal of an indictment absent evidence of unwarranted interrogation during the period of detention." Encarnacion, 239 F.3d at 400 n.5.

[5]   The district court appears to have resolved this issue by holding that identity information is not subject to suppression. See Garcia-Zavala, 2018 WL 1091973, at *7-8. We take a different tack, noting that we may affirm a district court's "suppression

There was no <u>Miranda</u> violation.  The government agreed not to use Garcia-Zavala's incriminating responses against him. And Garcia-Zavala's statements identifying himself, his date of birth, and his country of origin are not subject to <u>Miranda</u>.  <u>See</u> <u>United States</u> v. <u>Sanchez</u>, 817 F.3d 38, 45 (1st Cir. 2016) (noting the <u>Miranda</u> exception for routine booking questions not seeking to elicit incriminating responses).

We note a final matter:  At oral argument, Garcia-Zavala suggested that the van's passengers may have been racially profiled.  But he never developed this argument in his briefs and he offers no basis for finding clear error in the district court's factual finding to the contrary.

III.

We affirm the district court's denial of Garcia-Zavala's motion to dismiss and motion to suppress.

---

rulings on any basis apparent in the record."  <u>United States</u> v. <u>Arnott</u>, 758 F.3d 40, 43 (1st Cir. 2014).